ACCEPTED
05-14-00565-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
10/20/2014 10:26:37 AM
LISA MATZ
CLERK

# IN THE FIFTH COURT OF APPEALS
## DALLAS, TEXAS
## CAUSE NO. 05-14-00565-CV

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS

10/20/2014 10:26:37 AM
LISA MATZ
Clerk

**THE JW GST EXEMPT TRUST AND JAMES Y. WYNNE**
**Appellants**

**v.**

**WRENO S. WYNNE AND WILLIAM B. WYNNE**
**Appellees**

On Appeal from the 86th Judicial District Court
of Kaufman County, Texas
The Honorable Howard Tygrett, Judge Presiding

---

## APPELLANTS' BRIEF

---

BLAIES & HIGHTOWER, L.L.P.
421 W. Third Street, Suite 900
Fort Worth, Texas 76102
817-334-0800 (Phone); 817-334-0574 (Fax)

GREGORY P. BLAIES
State Bar No. 02412650

GRANT D. BLAIES
State Bar No. 00783669

GREG S. GOBER
State Bar No. 00785916

ATTORNEYS FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**

EXHIBIT A

# <u>TABLE OF CONTENTS</u>

IDENTITY OF PARTIES AND COUNSEL ............................................................iv

INDEX OF AUTHORITIES.......................................................................vi

STATEMENT OF THE CASE....................................................................1

STATEMENT OF FACTS .........................................................................3

ISSUES PRESENTED..............................................................................3

PROCEDURAL HISTORY........................................................................20

SUMMARY OF THE ARGUMENTS .......................................................25

ARGUMENT ............................................................................................26

    **FIRST POINT OF ERROR: The trial court erred in granting, in part, Wreno S. Wynne, American Liberty Oil Company, LLC, and American Liberty Oil Company, LP's First Amended Motion for Summary Judgment and in denying the JW GST Exempt Trust and James Y. Wynne's Motion for Summary Judgment. ............26**

        A.     Applicable Standard of Review ............................................26

        B.     The Statute of Limitations Bars the Appellee's Debt Claims ............27

        C.     The Notes are not Open Accounts ......................................36

        D.     The LP's Debt Claims are not Claims for Settlement of Partnership Accounts ........................................................38

        E.     The LP's Claim is not a Counterclaim arising out of the Same Occurrence or Transaction ................................................39

        F.     Judgment on the LP's Open Account Claim must be reversed and remanded ..................................................................41

    **SECOND POINT OF ERROR: The trial court erred in granting Appellees' Motions for Summary Judgment on Appellants' claims ..................................................................................42**

        A.     Standard of Review ..........................................................42

B.   A Genuine Issue of Material Fact Exists as to the Breach of the Members Agreement and the Operating Agreement and as to Appellants' Declaratory Judgment Claims ..........................................42

   1. Introduction....................................................................................42

   2. Delaware Law Governs..................................................................43

   3. The Duty of Good Faith and Fair Dealing under Delaware Law Imposes a Duty on the Member Majority of the LLC to Exercise their Discretion Reasonably and in Good Faith .............44

   4. The Evidence Establishes a Genuine Question of Material Fact as to whether Ben and Wreno Breached their Duty of Good Faith and Fair Dealing ........................................................46

   5. Alternatively, the denial of Member status to James following a Faulty Assignment of the Member Status Constitutes a Breach of the Members Agreement and the Operating Agreement....................................................................49

   6. The Recording of the Transfer constitutes a Ratification of the Membership Status of the Trust and/or a Waiver of the Right to Impose Conditions on the Trust for Member Status .......51

   7. James and the Trust have been Damaged as a Result of the Breach..........................................................................................53

C.   A Genuine Issue of Material Fact Exists as to Ben and Wreno's Breach of Fiduciary Duty....................................................................54

   1. Ben and Wreno Owed Fiduciary Duties of Loyalty and Care to James and the Trust as Members of the LLC and as Attorney for the LLC ....................................................................54

   2. Ben and Wreno Breached their Fiduciary Duty as Members of the LLC thereby causing injury ..................................................55

D.   Ben and Wreno Breached their Fiduciary Duty owed as Controlling Stakeholders of the LLC as the General Partner of the LP and their conduct justifies the Equitable Remedy of Disgorgement ......................................................................................57

E.    A Genuine Issue of Material Fact Exists as to Ben and Wreno's Fraud .................................................................................. 61

F.    A Genuine Issue of Material Fact Exists as to the Conspiracy Claim ................................................................................... 63

CONCLUSION AND PRAYER .............................................................. 64

CERTIFICATE OF SERVICE ............................................................... 67

CERTIFICATE OF COMPLIANCE ....................................................... 68

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Rule 38.1 of the Texas Rules of Appellate Procedure, the undersigned counsel for Appellant certify that the following is a list of all parties and counsel to the trial court's order, including a designation of trial and appellate counsel:

| | |
|---|---|
| **Plaintiffs/Appellants:** | The JW GST Exempt Trust and James Y. Wynne |
| **Plaintiff/Appellant's Counsel at Trial and on Appeal:** | Gregory P. Blaies (SBN 02412650)<br>E-mail: gregblaies@bhilaw.com<br>(Lead trial and appellate counsel) |
| | Grant D. Blaies (SBN 00783669)<br>E-mail: grantblaies@bhilaw.com<br>(Co-trial counsel and appellate counsel) |
| | Greg S. Gober (SBN 00785916)<br>E-mail: greggober@bhilaw.com<br>(Co-trial counsel and appellate counsel) |
| | BLAIES & HIGHTOWER, LLP<br>421 W. Third Street, Suite 900<br>Fort Worth, Texas 76102<br>817-334-0800 (telephone)<br>817-334-0574 (facsimile) |
| **Defendants/Appellees:** | Wreno S. Wynne and William B. Wynne |
| **Defendants/Appellees, Counsel at Trial and on Appeal:** | Hilaree A. Casada (SBN 24027676)<br>E-mail hcasada@cowlesthompson.com |
| | COWLES & THOMPSON, P.C.<br>901 Main Street, Suite 3900<br>Dallas, TX 75202 |
| | (Lead appellate counsel) |

David Bird (SBN 0233000)
E-mail: dbird@birdskibell.com

Skibell, Bohach & Archer, P.C.
17110 Dallas Parkway, Suite 214
Dallas, TX 75248

(Lead trial counsel for Wreno S. Wynne, American Liberty Oil Company, LLC, and American Liberty Oil Company, LP)

Eric D. Archer (SBN 01287500)
E-mail: earcher@birdskibell.com

Skibell, Bohach & Archer, P.C.
17110 Dallas Parkway, Suite 214
Dallas, TX 75248

(Lead trial counsel for William B. Wynne)

# INDEX OF AUTHORITIES

## CASES:

*ABC Express, Inc. v. Tigator Trucking Service, Inc.*,
  1996 WL 608478 (Tex. App. – Houston [14th Dist.] October 24, 1996,
  no pet.) ........................................................................................................40

*Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*,
  2009 WL 1124451 (Del. Ch. April 20, 2009) ...............................................45, 54

*Boxer v. Husky Oil Co.*,
  429 A.2d 995 (Del. Ch. 1981) .........................................................................58

*Bradford v. Vento*,
  48 S.W.3d 749 (Tex. 2001) .........................................................................62, 63

*City of Dallas v. Etheridge*,
  253 S.W.2d 640 (Tex. 1953) ............................................................................33

*City of Murphy v. City of Parker*,
  932 S.W.2d 479 (Tex. 1996) ............................................................................33

*Davidson v. FDIC*,
  44 F.3d 246 (5th Cir. 1995) ................................................................... 29-30, 34

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
  624 A.2d 1199 (Del. 1993)...............................................................................45

*Doyer v. Pitney Bowes, Inc.*,
  80 S.W.3d 215 (Tex. App. – Austin 2002, pet. Denied)...................................40

*Dunlap v. State Farm Fire & Casualty Co.*,
   878 A.2d 434 (Del. 2005)................................................................................44

*Edlund v. Bounds*,
  842 S.W.2d 719 (Tex. App.—Dallas 1992, writ denied)..................................29

*FM Props. Operating Co. v. City of Austin*,
   22 S.W.3d 868 (Tex. 2000) ...............................................................................26

*Gilbert v. El Paso Co.*,
   490 A.2d 1050 (Del. Ch. 1984) *aff'd* 575 A.2d 1131 (Del. 1990)....................46

*Greenbeg Traurig of N.Y., P.C. v. Moody*,
   161 S.W.3d 56 (Tex. App. – Houston [14th Dist.] 2004, no pet.).....................63

*Hilco Capital, LP v. Federal Ins. Co.*,
   978 A.2d 174 (Del. 2009)..................................................................................44

*HIS Indus., Inc. v. Keiger*,
   2013 Tex. App. LEXIS 6832 (Tex. App. – San Antonio June 5, 2013,
   no pet.) (mem. op.).......................................................................................36, 38

*Hoarel Sign Co. v. Dominion Equity Corp.*,
   910 S.W.2d 140 (Tex. App.—Amarillo 1995, writ denied) ........................29, 34

*Holman Street Baptist Church v. Jefferson*,
   317 S.W. 540 (Tex. App. – Houston [14th Dist.] 2010, pet. denied) ...........30, 31

*Hornblower v. Weeks-Hemphill, Noyes, Inc. v. Crane*,
   586 S.W.2d 582 (Tex. Civ. App. – Corpus Christi 1979, *writ ref'd n.r.e.*).......33

*In re Barr*,
   180 B.R. 156 (Bankr. N.D. Tex. 1995); *accord In re Hartman*,
   102 B.R. 90 (Bankr. N.d. Tex. 1989) ................................................................35

*In re USACafes, L.P. Litigation*,
   600 A.2d 43 (Del. Ch. 1991);
   *accord Wallace v. Wood*, 752 A.2d 1175 (Del. Ch. 1991) ...............................58

*International Banknote Co., Inc. v. Muller*,
   713 F.Supp. 612 (S.D.N.Y. 1989) .....................................................................54

*J.M.K. 6, Inc. v. Gregg & Gregg, P.C.*,
   192 S.W.3d 189 (Tex. App. – Houston [ 14th Dist.] 2006, no pet.)...................40

*Johnson v. Brewer & Pritchard, P.C.*,
    73 S.W.3d 193 (Tex. 2002) .............................................................................61

*Kelly v. Blum*,
    2010 WL 629850 (Del. Ch. February 24, 2010) ................................................54

*Kennedy v. Bender*,
    135 S.W. 524 (1911)..........................................................................................51

*King Ranch, Inc. v. Chapman*,
    118 S.W.3d 742 (Tex. 2003) .............................................................................42

*Knostman v. West Loop Savings Ass'n*,
    993 F.2d 90 (5th Cir. 1993) .............................................................................35

*KPMG Peat Marwick v. Harrison County Fin. Corp.*,
    988 S.W.2d 764 (Tex. 1999) ......................................................................26, 27

*Marshall v. Kusch*,
    84 S.W.3d 781 (Tex. App. – Dallas 2002, pet. denied) .....................................62

*Maxson v. Travis County Rent Account*,
    21 S.W.3d 311 (Tex. App. – Austin 1999, pet. Dismissed by Agr.) .................39

*McBryde v. Curry*,
    914 S.W.2d 616 (Tex. App.—Texarkana 1995, writ denied).....................29, 34

*McCamant v. Batsell*,
    59 Tex. 363, 1883 Tex. Lexis 172 (Tex. 1883)...........................................36, 38

*McConnell v. Southside Indep. Sch. Dist.*,
    858 S.W.2d 337, (Tex. 1993) ...........................................................................41

*Miller, Hiersche, Martens & Hayward, P.C. v. Bent Tree National Bank*,
    894 S.W.2d 828 (Tex. App. – Dallas 1995, no writ)........................ 30, 31, 32

*Myre v. Meletio*,
    307 S.W.3d 839 (Tex.App. – Dallas 2010, pet. denied) ...............................62

*Nelms v. Byrd*,
   1998 WL 175683 (Tex. App. -- Houston [14th Dist.] April 16, 1998,
   no pet.) ...................................................................................................39

*Old Republic Insurance Ins. Co. v. Fuller*,
   919 S.W.2d 726 (Tex. App. – Texarkana 1996 writ denied) ............................51

*Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*,
   583 F.3d 348 (5th Cir. 2009) .......................................................29, 34

*SJW Property Commerce, Inc. v. Southwest Pinnacle Properties, Inc.*,
   328 S.W.3d 121 (Tex. App. – Corpus Christi 2010, pet. denied).....................40

*Solutioneers Consulting, Ltd., v. Gulf Greyhound Partners, Ltd.*,
   237 S.W.3d 379 (Tex. App. – Houston [14th Dist.] 2007, no pet.)...................62

*Sun Exploration & Prod. Co., v. Benton*,
   728 S.W.2d 35 (Tex. 1987) ...........................................................51

*Warner v. Winn*,
   191 S.W.2d 747 (Tex. Civ. App. – San Antonio 1946, writ ref'd n.r.e.)...........39

*Westbrook v. Fidelity Bank of Dallas*,
   813 S.W.2d 752 (Tex. App – Fort Worth 1991, writ denied)...........................41

*White v. Harrison*,
   390 S.W.3d 666 (Tex. App. – Dallas 2012, no pet.).........................................51

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*,
   339 F.3d 101 (2d Cir. 2003) ...........................................................54

## STATUTES AND CODES:

TEX. BUS. ORG. CODE § 1.102 ...............................................................43

TEX. BUS. ORG. CODE § 1.105 ...............................................................44

TEX. CIV. PRAC. & REM. CODE § 16.004(a)(3) ........................................28

**OTHER:**

Paul M. Altman & Srinivas M Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469 (2005) ............................................................46

# STATEMENT OF THE CASE

This is an appeal from the trial court's granting of several Motions for Summary Judgment filed by Appellees as modified and reformed in the Final Judgment.  Appellants are James Y. Wynne (James), individually and on behalf of the JW GST Exempt Trust (the "Trust").    Appellees are the personal representatives of the estates of Wreno S. Wynne (Wreno) and William B. Wynne (Ben) – the deceased brothers of James Y. Wynne – as well as two entities, American Liberty Oil Company, LP (the LP) and American Liberty Oil Company, LLC (the LLC).  The three Wynne brothers were the principals of the LLC and the LP and all three had executed promissory notes to American Liberty Oil Company, Inc. (the Corporation) – the predecessor to the LP – which were ten years past due as of the filing of this suit.

Appellants initially filed this suit against Wreno and Ben alleging those two brothers had breached the Members Agreement governing membership rights in the LLC and had also breached their fiduciary duties and committed fraud by imposing unreasonable restrictions on admitting the Trust as a member and by failing to disclose their intent to impose those restrictions. (CR 11, 84).  The LP and LLC then intervened seeking to recover on James's promissory notes.  (CR 164, 187).  Appellants asserted the affirmative defense of limitations to the debt

claim and the parties filed opposing traditional Motions for Summary Judgment on that issue. (CR 179, 612, 1134, 1309). The trial court granted the LP's Motion for Summary Judgment, in part, holding that the sums incurred after the due date and in excess of the principal amount of the notes was an open account and not barred by limitations, the claim for monetary damages on the notes in question was barred by limitations but the claim for judicial foreclosure on the security for the notes was not barred by limitations and awarded attorneys' fees. (CR 2212). Subsequently, Appellees filed additional No-Evidence Motions for Summary Judgment seeking the dismissal of the tort, breach of contract and declaratory judgment actions filed by Appellants. (CR 1309, 1663). Appellees responded and a hearing was held on December 16, 2013. (CR 1989, 2419). The trial court granted Appellees' No-Evidence Motions for Summary Judgment and on February 7, 2014, entered a Final Judgment into which the court merged, "as reformed and modified," the November 13, 2012 interlocutory order ruling on the promissory note claims. (CR 2782, 2783, 2784). Appellants timely filed a Motion for New Trial in the trial court and have timely appealed the trial court's judgment to this Court. (CR 2790, 2826).

Appellants request this Court reverse the trial court's judgment and render judgment that the remedy of foreclosure granted by the trial court is barred by the statute of limitations, render a take nothing judgment on the attorneys' fees claims

and reverse and remand the grant of summary judgment on the LP's post-promissory note open account claim and all of Appellants' breach of contract, tort and declaratory judgment claims.

## ISSUES PRESENTED

The issue to be decided by this Court is whether the trial court erred in granting Appellees' Motions for Summary Judgment and denying Appellants' Motion for Summary Judgment. Appellants assert the following Points of Error on Appeal:

(1) The trial court erred in granting, in part, Wreno S. Wynne, American Liberty Oil Company, LLC and American Liberty Oil Company, LP's First Amended Motion for Summary Judgment and in denying the JW GST Exempt Trust and James Y. Wynne's Motion for Summary Judgment.

(2) The trial court erred in granting Appellees' Motions for Summary Judgment on Appellants' breach of contract, declaratory judgment, fraud, breach of fiduciary duty and conspiracy claims.

## STATEMENT OF FACTS

Wreno, Ben, and James are three brothers (the "Wynne Brothers") who, prior to July 1, 2002, were shareholders in American Liberty Oil Company, a Delaware corporation ("the "Corporation"). (CR 2074, 2507). Effective July 1, 2002, the Corporation converted into a Delaware limited partnership, American Liberty Oil Company, L.P. (the "LP"). (CR 2074, 2507). The Wynne Brothers are limited partners in the LP and are parties to the Agreement of Limited Partnership

(the "LP Agreement") governing the affairs of the LP. (CR 2075, 2112, 2113, 2508, 2545, 2546]. The Wynne Brothers also formed a Delaware limited liability company, American Liberty Oil Company, LLC (the "LLC") to serve as General Partner of the LP. Each brother owned a one-third membership interest in the LLC. (CR 2075, 2126, 2509, 2560). The LLC is governed by the Operating Agreement for American Liberty Oil Company, LLC and the three brothers are the parties to that agreement. (CR 2075, 2119, 2125, 2508, 2552, 2559). The Operating Agreement also included a Members Agreement in which the members agreed to restrictions on transfers of their LLC interests as well as pre-authorized transfers to specific trusts set up for Wreno and James. (CR 2075, 2129, 2131-32, 2508, 2564, 2565). The Members Agreement was attached to the Operating Agreement as Exhibit B and incorporated for all purposes. (CR 2075, 2124, 2508, 2558).

As allowed by the Members' Agreement, James wished to transfer his LLC membership interest to the Trust. On July 21, 2010, James wrote a letter informing his brothers that, as authorized by the LP Agreement and the Members Agreement, he intended to transfer his interests in the LP and the LLC to the Trust. (CR 2076, 2138, 2509, 2571). On July 26, 2010, his brothers replied stating:

> It is my understanding that you are represented by counsel on this matter and I presume counsel has advised you on the various legal and tax ramifications of these transfers, as well as all of the conditions that must be met for these transfers under Section 3.c.1 and 13.8(a) respectively. Additionally, please note that there are additional requirements elsewhere to the documents that apply to such transfers.

(CR 2140, 2573]. Wreno signed the letter in his capacity as General Attorney for the LP as well as a Member of the LLC.

On August 18, 2010, James sent a letter to Wreno denying he was represented by counsel and asking Wreno, as general attorney for the entities in which James was a shareholder and a member, to provide James with the "additional requirements" referenced in the July 26 Letter. (CR 2142, 2575). Wreno never responded to James's letter and refused to provide the requested information until after the transfer of James's LLC interests was completed. (CR 2030, 2077, 2465, 2510).

At around that same time, Wreno reached out to outside counsel regarding his concerns about how the transfer of James's interests would affect the LP's rights with respect to promissory notes James owed to the Corporation and the security for those debts. (CR 2050-2052, 2055, 2485-2488]. In those conversations, Wreno sought advice with respect to a mechanism for protecting

the collateral for the notes which consisted of James's interests in the LP.  (CR 2057-2058, 2489-2490).

On January 13, 2011, James executed an Assignment and Assumption of Membership Interest (the "Assignment"), transferring his LLC membership interest to the Trust as contemplated under the Members Agreement.  (CR 2077, 2510).  The Assignment provided "Assignor [James] hereby assigns, transfers, conveys, and delivers to Assignee [the Trust] the transferred interest."  (CR 2145, 2578).  In addition, the Assignment further provided "Assignee thereby becomes a substitute Member in place of Assignor."  (Id.)  James gave a copy of the Assignment to Wreno and Ben after executing it.  (CR 2077, 2510).

In the afternoon of January 18, 2011, James, Wreno and Ben participated in a discussion concerning the Assignment.  (CR 2077, 2510).  During the discussion, Wreno raised one minor issue regarding a reference in the "whereas" clause to an incorrect section of the Members Agreement and requested that the reference be revised.  (CR 2039-2040, 2077, 2474-2475, 2510).  However, Wreno and Ben did not tell James they disagreed that the Trust became a substitute Member of the LLC as stated in the Assignment.  (CR 2077-2078, 2510-2511).  After the discussion regarding the revision, James's attorney corrected the error and a revised version of the Assignment was immediately delivered to Wreno and Ben who signed to acknowledge receiving it.  (Id.; CR 2148, 2581).  Although

James's attorney participated in the early stages of the meeting via telephone, once the mistaken section reference was revised, she got off the phone and the meeting continued. (CR 2077-2078, 2474-2475).

At some point in the meeting after James's attorney was no longer present, Wreno asked James "are you sure you want to do this?" (CR 2042, 2078, 2476, 2511). James interpreted Wreno's tone of voice to be threatening, so he asked Wreno why he would ask that question. (CR 2078, 2511). Wreno responded by stating "you may not be happy with the result." (Id.). James asked Wreno to clarify that statement but Wreno refused. (Id.). During that conversation, Wreno never told James "there were certain terms and conditions that the trust would have to meet in order to attain member status." (CR 2043, 2078, 2477, 2511). When asked whether he was thinking about those "terms and conditions" when he failed to disclose them in that conversation, Wreno testified "he was fully aware" of section 14 of the Operating Agreement and Section 3(b) of the Members Agreement "at the time." (CR 2043, 2477).

At the conclusion of the meeting concerning the assignment, Wreno requested that James provide him with a proxy authorizing James to represent the Trust at the Members' Meeting scheduled for that afternoon. (CR 2079, 2512). After the proxy was provided, Wreno, Ben and James proceeded to conduct a meeting of the LLC Members regarding an upcoming engagement at the LP's

conference center. (Id.).  In this meeting, Wreno, Ben and James (on behalf of the Trust) took action as Members of the LLC without objection to the Trust's participation as a member.  (Id.).

However, at a Member's Meeting at noon on the next day, January 19, 2011, Wreno and Ben presented James with a letter advising the Trust that Wreno and Ben, as the Member Majority, were now taking the position: (1) that they had the right to refuse the Trust's admission as a Member of the LLC; and (2) they were unwilling to admit the Trust at such time.  (CR 2079, 2150, 2512, 2583). The Member Majority's position, as stated in the letter, was that neither the Trust nor James was a member of the LLC at that time, and pursuant to §14.1 of the Operating Agreement, the Member Majority had the right to require the Trust to comply with certain unspecified "terms and conditions" before admitting the Trust as a member.  (Id.). This was the first time Wreno and Ben revealed to James their intent to impose certain conditions on the Trust's ability to attain member status in the LLC.  (CR 2077, 2510).  The provision relied upon in the January 19th letter, i.e., §14.1 of the Operating Agreement, was omitted from the letter of July 26, 2010, referring to unspecified "additional requirements."  (CR 2077, 2510).

The LLC's Minutes reflect that Ben conferred with counsel on the 19th to confirm the position of the Member Majority that the Trust was not currently a Member.  (CR 2048-2049, 2483-2484).  Ben's personal attorney was Melissa

Pegram, and she assisted Wreno with drafting the January 19 Letter.  (CR 2031-2034, 2466-2469).  Despite the fact that Ben was represented by counsel, Wreno, acting in his capacity as general attorney for the LLC, discussed the January 19 Letter and its contents with Ben prior to delivering the letter to James.  (CR 2031-2034, 2466-2469).  In contrast, despite James's repeated requests for information about the terms and conditions referenced in the vague July 26 Letter, Wreno refused to provide James with an answer because James "was represented by other counsel."  (CR 2030, 2465).  Likewise, in the ongoing tax lawsuit in which James was a party, Wreno had taken an active role in drafting responses to discovery on James's behalf despite the fact that James was represented by outside counsel. (CR 2063-2067, 2495-2499).

Section 14.1 of the Operating Agreement, the section cited in the January 19th Letter, provides as follows:

> New Members may be admitted to the Company only upon the written approval of a majority in interest of the Members of the Company, and shall be admitted upon such terms and conditions as such Members may determine, consistent with this Agreement and the Members Agreement, the Company's Certificate of Formation and any applicable provision of law or rule of a governmental agency or self-regulating organization which has jurisdiction of the business of the Company.

(CR 2124-2125, 2557-2558).

The Members Agreement provides:

(a) Sale or Transfer.  No Member may make a Transfer except in accordance with this Agreement.  A Transfer will not be recorded on the books of the company until the Member owning such Membership Interest has fully and completely complied with the terms of this Agreement and any additional requirements imposed by the Member Majority. Any purported Transfer in violation of this Agreement will be null and void and will not operate to Transfer any interest or title in the purported Transfer.

(b) Membership Interest.  Notwithstanding anything to the contrary, no Transferee will become a Member without complying in all respects with this Agreement and any additional requirements imposed by the Member Majority.  As a condition precedent to any Transfer, the Company may require the Transferee to execute a written instrument in form satisfactory to the Members in which such Transferee must agree to be bound by all of the terms of the Agreement.

However, Paragraph 3(c)(1) of the Members Agreement provides:

The Members agree that Wreno S. Wynne is authorized to transfer his Membership Interest to the WW GST Exempt Trust, A Texas trust, and James Y. Wynne is authorized to transfer his Membership Interest to the JW GST Exempt Trust, a Texas Trust.

(CR 2130-31, 2564-65).

Several weeks later, on February 11, 2011, Ben and Wreno advised the Trust of the "conditions" that they had determined had to be met before they would allow the Trust to be admitted as a member. (CR 2152, 2585).    The conditions imposed by Ben and Wreno required that:

(1) the Trust and James execute a new note as joint obligors for a debt owed by James to the LP and reaffirm and acknowledge the security for that debt;

(2) the Trust agree to unspecified adjustments to its capital account in the LP as additional noticed assessments under the LP Agreement;

(3) Todd Wynne (James's son) pay sums due to the LP resulting from the alleged breach of a contract between Todd Wynne and the LP;

(4) the Trust execute a document agreeing to be bound by all the terms of the Members' Agreement and the Operating Agreement;

(5) the Trust agree to appoint one Trustee to act on its behalf with respect to the LLC business and to give the LLC thirty days notice of a change in this representative;

(6) the Trust agree that a change in its Trustees shall constitute a transfer of membership interests and thus trigger the application of the terms and conditions of imposed by the Members Agreement and Operating Agreement on such transfers; and

(CR 2152, 2585).  Oddly enough, the first two requirements addressed the Trust's rights and obligations, with respect to LP interests (not LLC interests) transferred or to be transferred to it by James.  (CR 2059-2060, 2491-2492).  For example, Wreno and Ben wanted the Trust to admit that should James transfer his LP interest to the Trust, the LP would have a lien for James's debts on the Trust's LP interests.  (Id.).

However, the LP Agreement specifically authorized a transfer of those LP interests from James to the Trust notwithstanding any other provisions in the Agreement.  (CR 2106, 2539, 2613).  All three of the brothers agreed to the terms

of the LP Agreement allowing unfettered transfers of the LP interests knowing that each of them owed debts to the LP at the time they entered into the Agreement. (CR 2613-2615). Ben acknowledged the terms of the LP Agreement were heavily negotiated and that despite the fact James owed approximately $2 million to ALOC at the time, the three brothers all agreed that he could transfer his LP interest to the Trust without restriction. (CR 2615-2616).

On July 11, 2011, counsel for the Trust informed Ben and Wreno the Trust was rejecting the proposed conditions. (CR 2080). In correspondence dated July 14, 2011, Wreno and Ben stated since the Trust was merely an "Assignee of a Member's Interest" and James was nothing more than a limited partner of the LP, neither was entitled to take part in the management of the company, James would be prohibited from further access to his office and the company property, and James would be charged with "criminal trespass" if he attempted to gain access or entry to the LLC office. (CR 2156-2157, 2589-2590).

Among the decisions that James and the Trust were excluded from was the decision to admit Wreno's children as new Members of the LLC without providing James or the Trust with the right of first refusal provided for in the Operating Agreement. (CR 2018, 2514, 2671). Transfers to Members' children are not included in the specifically authorized Transfers pursuant to the Members Agreement. (CR 2131-2132, 2564-2565). Thus, the transfer was not allowed or,

at the very least should have been subject to the right of first refusal for the members as set forth in the Members Agreement.  (CR 2132, 2565).  Moreover, Wreno and Ben allowed Erin and Wreno Wynne, Jr. to become "members" of the LLC without meeting the requirements that they had imposed on the Trust.  For example, Wreno and Ben did not request that Wreno's children execute new notes for Wreno's debt similar to what Ben and Wreno demanded of the Trust.  (CR 2494).

In December of 2011, Ben and Wreno recorded the transfer of the LLC interest from James to the Trust.  (CR 2044, 2478).  Ben acknowledged that he reviewed the Assignment, including the "substitute Member" reference, prior to entering the transfer into the books of the LLC.  (CR 2611-2612).

The debts that were the subject of several of the conditions imposed on the Trust's to attain Member status were three promissory notes.  These Promissory Notes, all entitled "Separate Property Renewal Note" and listing James as the Maker and the Corporation as the Payee were the subject of the LP's and LLC's First Amended Motion for Summary Judgment and Appellants Motion for Summary Judgment.  (CR 1134, 1309).  The largest of the three, in the principal Amount of "$1,850,000.00 or so much thereof as shall be advanced and unpaid from time to time" was dated July 1, 2000 (the "$1,850,000 Note").  (CR 206, 1196, 1358).  The $1,850,000 Note stated that "[t]he principal sum of this Note

represents indebtedness on the date hereof and future advances to cover interest accruing monthly on the unpaid principal balance and additional advances ***not to exceed in total the principal sum hereof*** when the advance is provided." (Id.)(emphasis added).    The $1,850,000 Note also stated that "[t]he principal balance and all accrued unpaid interest shall be due on or before June 30, 2001." (Id.).    The LP judicially admitted that the maturity date for the $1,850,000 Note was June 30, 2001.    (CR 1187).

The second note was in the principal amount of $206,204.24, (the "$206,204.24 Note") and the third was in the principal amount of $90,725.19. (the "$90,725.19 Note").    (CR 264, 322, 1444, 1502).    The LP admitted that the maturity dates for two smaller Notes was July 1, 2001.    (CR 1187).

All three Notes contained a covenant obligating the Maker to "pay to the order of Payee at the place for payment and according to the terms of payment the principal amount plus interest at the rates stated above."  (CR 206, 264, 322, 1196, 1358, 1444, 1502).    Likewise, all of the Notes stated that "[a]ll unpaid amounts shall be due by the final scheduled payment date." (Id.).

The three Notes were the final in a series of similar notes dating back over a decade.    The $1,850,000 Note was the eleventh in series of renewals of a debt that originated with a December 27, 1989 note.    (CR 1191, 1897).    Each note reflected the decision of the parties to the note to "roll" the preceding year's principal and

interest into a new "renewal note" extending the maturity date.  (CR 1159, 1191, 1897).  When the $1,850,000 Note matured on June 30, 2001, the note was unpaid. However, unlike in past years, the $1,850,000 Note was not renewed and the amount owed was not rolled over into another renewal note.  Thus, the parties let the final maturity date stand.  (CR 1160-61, 1866-67).

Renewals of at least two of the notes, including the $1,850,000.00 Note, were prepared by Wreno for James to sign in 2001.  (CR 1226, 1229).  However, the drafts were presented to James and he declined to sign the renewals.  (CR 1161-1164, 1867-1870).  Wreno Wynne does not recall presenting James with additional renewal notes in subsequent years.  (CR 1165, 1871).  The draft renewal note for the large note reflects a principal balance of $1,833,782.82 which was the exact amount due and owing on June 30, 2002.  (CR 1226, 1368).  Thus, the Draft Renewal Note differs from past practice in that it did not allow for future advances up to a specified amount.  (Wreno Wynne Dep. [Exh. A] at P. 38, L. 8 – P. 39, L.17).

With respect to "Advances," the $1,850,000 Note specifically provided that "[t]he principal sum of this Note [$1,850,000] represents indebtedness on the date hereof and future advances to cover interest accruing monthly on the unpaid principal balance and additional advances not to exceed in total the principal sum hereof when the advance is provided."  (CR 206, 1196, 1358).  Despite the stated

maturity date on the note and the express limitation on the amount the Corporation intended to advance pursuant to the Note, Wreno continued to apply advanced sums to the general ledger account for the $1,850,000 Note after the maturity date and even after the amounts totaled in excess of the stated $1,850,000 limitation. (CR 1191-1192, 1898-1899).   Wreno did so instead of applying those sums to other general ledger accounts that existed for James's personal expenses or to a new general ledger account that he could have created.   (CR 1171-1175, 1877-1881).

Wreno admitted the $1,850,000 Note did not authorize the Corporation to continue posting advances to the account for that Note after maturity or to continue posting amounts to that account after the $1,850,000 principal amount had been advanced.   (CR 1174, 1880).    Wreno also acknowledged nothing prevented him from opening up a separate account for the amounts advanced after the maturity date of the $1,850,000 Note.   (CR 1175, 1881).   James never consented to the application of his advances for personal expenses to the ledger account for the $1,850,000 Note after the maturity date.   (CR 1191-1192, 1898-1899).

The $206,204.24 Note and the $90,725.19 Note were also the last in a long series of renewals of notes.   (CR 1191, 1898).   The $206,204.24 Note, the $90,725.19 Note and the notes preceding carried a one year term and required

payment of the principal plus interest on or before the maturity date.  (CR 264, 322, 1191, 1444, 1502, 1898 ).  As with the $1,850,000 Note, instead of renewing the smaller notes in 2001, the parties chose to allow the final maturity date to stand.  (CR 1190, 1897).  The balances on these two smaller notes remained static because the parties decided not to charge interest on the sums due.  (CR 1167, 1873).

The LP claims that the $1,850,000 Note was subject to a series of Security Agreements signed by the Corporation and James.  (CR 230-260, 1386-1413).  In summary, the collateral to which those Security Agreements attached was listed at the bottom of the first page of the $1,850,000 Note.  (CR 206, 1196, 1358).  The Corporation stock that allegedly secured the $1,850,000 Note was identified by specific certificate numbers in the Third and Fourth Modifications of the Security Agreement as stock shares A-94, A-95, A-114, A-117, B-13, B-19, B-20 and 1/3 of B-16.  (CR 247, 253, 1400, 1406).

The $206,204.24 Note is likewise subject to a series of Security Agreements signed by the Corporation and James.  (CR 284-318, 1463-1500).   The collateral to which these Security Agreements attach is listed at the bottom of the first page of the $206,204.24 Note and consists of shares of Class "A" and Class "B" stock in the Corporation identified by the certificate numbers for the shares of stock.  (CR 264, 1444).

The LP also claims that the $90,725.19 Note is subject to a Security Agreement signed by James.  The collateral securing this Note is listed at the bottom of the first page of the Note and consists of shares of Class "A" and Class "B" stock in ALOC, Inc. identified by certificate numbers.  (CR 322, 1502).

The LP admits that the stock certificates bearing numbers A-117, A-128 and A-133 are not in their possession and that their whereabouts are unknown. (CR 1178-1179, 1882, 1883).  Likewise, the LP also admits that stock certificate number A-73 was not located until Wreno found it in James's desk and took possession of it after they had locked James out of his office.  (Id.).

On July 1, 2002, the Corporation was converted from a Delaware corporation to the LP with the LLC as the general partner.  (CR 1350).  At the time of the conversion, no certificated shares were issued for the LP or LLC.  (CR 1272, 1350).

At the time Ben and Wreno caused the LP and LLC to bring suit to collect on the Promissory Notes, those two brothers also owed substantial debts to the LP in the nature of notes and open accounts.  (CR 2621-2667, 2669).  Some of these debts had been in default for almost a decade and were in default as of the date the LP and the LLC brought suit against James and the Trust.  (CR 2621-2667).  Some of Ben and Wreno's debts to the LP are secured by their one-third share of ownership in the LP. (CR 2669).

Despite this fact, Wreno and Ben refused to act as controlling members of the general partner to declare their significant debts to the LP in default and collect or foreclose upon those debts. (CR 2493, 2681). Instead, Ben and Wreno engaged in a scheme to wash out the debt they owed to the LP by making dummy distributions to credit their debt accounts. Specifically, Ben and Wreno engaged in an accounting scheme whereby each shareholder received a monthly $10,000.00 distribution designated as a "Distribution K" beginning in January 2009. (CR 2621-2667, 2681, 2687-2688). The Distribution K's were credited directly to each limited partner's debt and the limited partner's capital account was debited a corresponding amount. (CR 2599, 2603, 2681, 2687-2688). Prior to those credits being applied to Ben and Wreno's debts, those two brothers together owed over $1,000,000.00 in receivables to the LP. (CR 2641-2643). James was not aware of the Distribution K's and had never agreed to them. (CR 2681).

These Distribution K's were made in breach of the LP Agreement. Pursuant to section 9.1 of the LP Agreement the general partner could only make distributions from "available cash" and the LP did not have the available cash to make the sham distributions. (CR 2095, 2528, 2604, 2681). In addition, the LP Agreement did not permit the partners to withdraw or receive any return of their capital contributions. (CR 2092, 2525). Moreover, the distribution K's did not

benefit James since the amount of the distributions did not exceed the interest

accruing on his debt.  (CR 2681).

## PROCEDURAL HISTORY

The Trust filed this lawsuit against Wreno and Ben on August 10, 2011.

(CR 11).  The Trust asked the court to enter declarations to clarify that Wreno and

Ben's actions in excluding James and the Trust from the management of the LP

were wrongful and unauthorized under the applicable agreements and that the

conditions imposed for member status were unreasonable and unlawful.  Ben and

Wreno answered and Wreno filed a counterclaim against the Trust for declaratory

judgment.  (CR 41, 43, 46).  Subsequently, James intervened and James and the

Trust asserted claims for breach of the Members Agreement and the Operating

Agreement, breach of fiduciary duty, fraud, conspiracy and injunctive relief in

addition to the declaratory judgment claims.  (CR 84).  On March 5, 2012, the LP

and LLC filed their Original Petition in Intervention, Motion to Align Parties,

Counterclaim and Request for Disclosure.  (CR 164).  In their initial pleading, the

LP and the LLC sued James and the Trust for "the aggregate amount of the notes

and open account debt, including unpaid interest on the unpaid sums."  (CR 169).

In addition, the LP and LLC sued to "foreclose their security interest in the

collateral [for the Notes] . . . ."  (Id.)  The LP and LLC also asserted a claim for

attorneys' fees under Section 38.001 of the Civil Practice & Remedies Code.  (CR 170).

James and the Trust answered the Petition in Intervention, asserted the affirmative defense of limitations and specially excepted to the Intervention on the basis that the Intervention failed to identify the specific notes and security agreements forming the basis of the suit and failed to identify the collateral upon which foreclosure was sought.  (CR 179).  The LP and LLC responded to the exceptions by filing an Amended Original Petition in Intervention on April 16, 2012.  (CR 187).  The LP and LLC specifically asserted that they sought foreclosure of "such collateral which is in the possession of [the LP and LLC]" and attached a list of the specific stock certificates for the Corporation which they alleged were in their possession and for which they sought foreclosure.  (CR 193, 195, 262).  The LP and LLC requested judicial foreclosure or a judgment allowing them to conduct a private foreclosure sale.  (CR 200)  In the amended intervention, the LP and LLC also specifically cited the provisions of the Notes as the basis for their attorney fee claims.  (Id.).  James and the Trust then filed an Amended Answer again asserting the defense of limitations.  (CR 746).

Eventually, both Appellants and Appellees – the LLC and LP – filed competing motions for summary judgment on the LP and LLC's debt and open account claims.  (CR 1134, 1309).  Appellants contended that the remedies sought

by Appellees were barred by the statute of limitations and that the Notes were not

open accounts or claims to settle partnership accounts. (CR 1142, 1143, 1146).

The LP and LLC countered that the recovery on the promissory notes was not

barred because the notes were actually open account loans or partnership accounts,

or that the suit on the debts was a compulsory counterclaim that was revived by

the operation of Tex. Civ. Prac. & Rem. Code §16.069(a). (CR 1326-28). The LP

also argued that the court could enter judgment for foreclosure on the security for

the Notes even if limitations barred a money judgment. (CR 1329). The LP never

argued that it was owed under an open account separate and apart from the

argument that the whole note debt was an open account. (CR 1309-37)

On August 21, 2012, the Trial Court heard Appellees' First Amended

Motion for Summary Judgment and Appellants' Motion for Summary Judgment

on the debt issues. On November 13, 2012, the court signed an interlocutory order

granting Appellees' First Amended Motion for Summary Judgment in part and

denying Appellants' Motion for Summary Judgment. (CR 2212).

That interlocutory order was "reformed and modified" in the Final Judgment

entered on February 7, 2014, and "where consistent with [the] Final Judgment"

was "merged" into the Final Judgment. (CR 2783-4784) Among other things, the

Final Judgment modified the interlocutory judgment by granting relief only to the

LP rather than to both the LLC and LP. (Id.) In the Final Judgment, the court

held that the LP's right to foreclose on the collateral for the Notes was not barred but that the action for damages on the promissory notes was barred by limitations. (CR 2784). Thus, the trial court rejected the open account, partnership account and compulsory counter-claim arguments when it held that a money judgment on the Notes was barred by limitations. However, contrary to its ruling that the action for damages on the promissory notes was barred by limitations, the trial court entered final judgment that the LP "shall have and recover judgment in the total sum of $4,332,381.28 for principal and interest" on the Notes. (CR 2785). The court then granted judgment for "judicial foreclosure" on the collateral securing the promissory notes which it characterized as the Trusts' one-third interest in the LLC, James's one-third interest in the LP and James's interests in Ozelle Pharmaceutical, Inc. and Ozelle, LLC and ordered that the money judgment on the notes be paid solely from the foreclosure without personal liability to James and the Trust. (Id.). The court also held that the monies advanced by the LP to James on and after July 18, 2001 were open account loans not barred by the statute of limitations entered judgment for the LP and against James in the amount of $228,464.10 on the open account debts. This relief was not specifically requested in the LP's Motion. (CR 1309-37). Lastly, the court awarded attorneys' fees in the amount of $44,528.98 to the LP and Wreno without specifying the grounds for the award or segregating the amounts. (CR 2786).

The Final Judgment also granted the No-Evidence Motions for Summary Judgment filed by Wreno, the LLC, the LP and Ben with respect to Appellants' affirmative claims for relief that were heard on December 16, 2013.  (CR 2783-84).  However, the Final Judgment also appears to have granted Wreno's and the entities' Traditional Motion for Summary Judgment on Appellants' claims despite that Motion never being heard.  (CR 2412, 2782-83).

In the pleadings that were in effect as of the date of the December 16, 2013 no-evidence summary judgment hearing, the Trust and James asserted that Wreno and Ben breached the Members Agreement and their fiduciary duties and committed fraud in connection with James's transfer of his membership interest to the Trust.  (CR 2224).  James and the trust also brought claims for minority shareholder dilution arising out of the sham Distribution K's.  (CR 2236).  In addition, the Trust and James sought various declarations from the Court to determine their respective rights under the Members Agreement and the Operating Agreement and asked the trial court to declare that either the Trust or James was a Member of the LLC.  (CR 2233).  Appellants also sought injunctive relief and specific performance to enforce their rights.  (CR 2234, 2236-2237).  Lastly, in a Supplemental Petition, Appellants asserted the affirmative defenses and declaratory judgment actions alleging that Ben and Wreno had ratified the transfer of membership status from James to the Trust or waived the right to impose

conditions since they had recorded the transfer of member status in the assignment.  (CR 2416).  The Supplemental Petition also contained additional claims for breach of fiduciary duty against Ben and Wreno as controlling stakeholders of the LP.  (CR 2417).  As set forth in the Final Judgment, the trial court granted the Appellees' Motions for Summary Judgment on behalf of Wreno, the LLC, the LP and Ben and entered a take nothing judgment on all of the affirmative and declaratory claims filed by James and the Trust. (CR 2786).

## SUMMARY OF THE ARGUMENTS

The Judgment granting the LP the remedy of judicial foreclosure, a money judgment on the notes and attorneys' fees must be reversed and judgment rendered for Appellants because the four year statute of limitations bars the LP from filing suit in 2012 to recover a judgment of any sort arising out of note obligations that matured in 2001.

The Judgment granting an award of monetary damages to the LP on its open account claim for sums advanced on or after July 18, 2001 must be reversed and remanded because the LP did not conclusively prove all the elements of its cause of action on an open account and the Motion for Summary Judgment did not specifically request the relief granted by the court.

The Judgment granting Appellee's Motions for Summary Judgment dismissing Appellants' breach of contract, declaratory judgment, breach of

fiduciary duty, fraud and conspiracy claims and granting attorneys' fees to Wreno

must be reversed because there is a genuine issue of material fact as to each and

every element of the Appellants' claims.

## ARGUMENT

**FIRST POINT OF ERROR:  The trial court erred in granting, in part, Wreno S. Wynne, American Liberty Oil Company, LLC, and American Liberty Oil Company, LP's First Amended Motion for Summary Judgment and in denying the JW GST Exempt Trust and James Y. Wynne's Motion for Summary Judgment.**

### A.    Applicable Standard of Review

The standard for reviewing a summary judgment is whether the successful

movant in the trial court carried its burden of showing there is no genuine issue of

material fact and judgment should be granted as a matter of law. *KPMG Peat

Marwick v. Harrison County Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).   The

reviewing court should take as true all evidence favorable to the non-movant and

make all reasonable inferences in the nonmovant's favor. *Id.*  Where, as here, both

sides move for summary judgment and the trial court grants one motion and denies

the other, the reviewing court should review *de novo* all summary judgment proof,

determine all issues presented, and render the judgment that the trial court should

have rendered. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872

(Tex. 2000).

A defendant moving for summary judgment on the affirmative defense of limitations has the burden to (1) conclusively prove when the cause of action accrued and (2) negate the discovery rule or any other theory of avoidance, if applicable. *KPMG Peat Marwick*, 988 S.W.2d at 748. If the movant establishes the statute of limitations bars the action, the non-movant must then present summary judgment evidence raising a fact issue in avoidance of the statute of limitations, or to be entitled to summary judgment on the issue of limitations, must conclusively prove the exception. *See Id.*

### B.    The Statute of Limitations Bars the LP's Debt Claims.

The LP brought suit on the Notes on March 5, 2012. (CR 164). The suit sought a judgment for money damages, foreclosure and attorneys' fees. The claim for attorneys' fees was premised on a paragraph in the Promissory Notes that provided for an award of attorneys' fees. (CR 200). Appellants timely asserted the affirmative defense of the four year statute of limitations in response to the suit. (CR 746). The Trial Court granted a partial interlocutory summary judgment in favor of the LP on the debt claims and denied Appellees' Motion for Summary Judgment. (CR 2212). That interlocutory summary judgment, "as reformed and modified," was "merged" into the February 7, 2014 Final Judgment, where "consistent" with that Final Judgment. (CR 2783-84). In the Final Judgment, the trial court agreed with the Appellants and held that "the action for ***damages*** on the

Promissory Notes . . . is barred by the statute of limitations." (CR 2784) (emphasis added). However, contrary to this ruling, the trial court entered judgment that the LP "shall have and recover judgment in the total sum of $4,332,381.28" for principal and interest on the $1,850,000 Note, plus $172,234.95 and $42,178.11 on the two smaller notes. (CR 2785). The court then granted the LP "the right to foreclose on the collateral securing such Promissory Notes by judicial foreclosure" and decreed that "the judgment amounts shall be paid from the foreclosure of the collateral of the Promissory Notes without personal liability to [James] and [the Trust]." (Id.). Thus, the Trial Court actually did enter a money judgment for the time barred damages but limited the means of the collection of the damages. In addition, the trial court entered a judgment against James and the Trust and in favor of the LP for attorneys' fees in the amount of $44,528.98 incurred through the date of the August 21, 2012 hearing on the Promissory Note motions. The means of collection on the attorneys' fees was not limited. (CR 2786).

Pursuant to Section 16.004(a)(3)(a) of the Texas Civil Practice and Remedies Code, "[a person must bring suit" on an action for debt "not later than four years after the day the cause of action accrues." TEX. CIV. PRAC. & REM. CODE § 16.004(a)(3). When a note is payable at a definite time, limitations begin

to run at the maturity of the note. *Edlund v. Bounds*, 842 S.W.2d 719 (Tex. App. –
Dallas 1992, writ denied).

It is undisputed that the two smaller notes matured on July 1, 2001, the
$1,850,000 Note matured on June 30, 2001, and the LP did not bring suit to
enforce its rights under the Notes or the Security Agreements until March 5, 2012.
(CR 164, 1187).  Consequently, the trial court appropriately ruled that the LP's
claims for damages on the Promissory Notes are barred by the four year statute of
limitations.  However, the trial court erred by granting the LP the remedies of
judicial foreclosure, attorneys' fees and, a judgment that the LP "shall have and
recover judgment" for certain sums for principal and interest on the Notes.  A suit
for those remedies, brought after the expiration of the statute of limitations, is
barred just as is the suit for recovery of money damages on the Notes.  *See e.g.,
Hoarel Sign Co. v. Dominion Equity Corp*., 910 S.W.2d 140, 144 (Tex. App. –
Amarillo 1995, writ denied) (limitations on debt bars claim to foreclose lien on
personal property); *McBryde v. Curry*, 914 S.W.2d 616, 619 (Tex. App. –
Texarkana 1995, writ denied) (suit to collect on life insurance proceeds pledged as
security for note barred by limitations); *Rabo Agrifinance, Inc. v. Terra XXI, Ltd*.,
583 F.3d 348, 352 (5th Cir. 2009) (action to foreclose on personal property barred
when limitations has run on collection of debt); *Davidson v. FDIC*, 44 F.3d 246,

253 (5th Cir. 1995) (under Texas law of chattel mortgages the mortgage follows the debt it secures and limitations on lien tracks limitations on debt).

In an attempt to distinguish the remedy of foreclosure from the remedy of monetary damages the LP cited the trial court to two cases: *Miller, Hiersche, Martens & Hayward, P.C. v. Bent Tree National Bank*, 894 S.W.2d 828 (Tex. App. – Dallas 1995, no writ) and *Holman Street Baptist Church v. Jefferson*, 317 S.W.3d 540 (Tex. App. – Houston [14th Dist.] 2010, pet. denied). However, these cases have absolutely no application to the circumstances at hand, that is, a creditor bringing time barred claims in a suit against the debtor, because both cases involved the attempted use of limitations by a debtor or a third party to terminate a substantive right rather than as a procedural bar to bringing suit.

For example, in *Miller, Hiersche,* the creditor, Bent Tree National Bank (the "Bank"), had in its possession certificated securities that had been turned over to the bank as security by the guarantor, Sherwood Blount, Jr. *Miller, Hiershe*, 894 S.W.2d at 828. Blount subsequently pledged those same certificated securities to guarantee an account with the Miller, Hiersche law firm (the "Law Firm"). (Id.). The Law Firm then notified the Bank of the firm's alleged security interest and of the fact that the Law Firm had already foreclosed on the certificates. *Id*. at 828-29. The Bank brought suit to determine its rights to the stock certificates it physically possessed as collateral *vis a vis* the alleged security interest of the Law Firm. *Id*.

at 829.  In turn, the Law Firm claimed a superior interest in the collateral due to the expiration of the statute of limitations on the Bank's claim against Blount. That is, for all intents and purposes, the Law Firm took the position that the running of the statute of limitations had terminated the Bank's substantive right to the collateral in the Bank's possession.

This court held that the statute of limitations was a personal privilege that could only be asserted by the debtor or one in privity with the debtor.  *Id*.  The Law Firm, as a creditor with a competing security interest was neither a debtor nor one in privity with the debtor.  The court then recognized that "[t]he fact that an action for recovery of a debt is barred by the statute of limitations does not destroy the debt" and that limitations "affects the remedy only."  *Id*.  Consequently, the court rejected the Law Firm's claim that limitations had the effect of terminating the Bank's substantive rights and affirmed the trial court's grant of summary judgment allowing the Bank to foreclose on the securities in its possession.  *Id*. at 830.

Similarly, in the *Holman Street Baptist* case, the debtor had physically placed securities with the creditor as collateral for a debt.  *Holman Street Bap't.*, 317 S.W.3d at 542-43.  Eventually, the debtor brought suit against the creditor seeking an order requiring the creditor to return the securities in its possession to the debtor on the basis that the statute of limitations had run on the debt.  *Id*. at

544. The creditor counterclaimed to collect on the note arguing that the debtor had revived the creditor's claim by seeking affirmative relief and thus the creditor was entitled to utilize Tex. Civ. Prac. & Rem. Code § 16.069(a) to file an otherwise barred counterclaim against the debtor. *Id.* at 544-45. In response, the debtor contended that he had not made an affirmative claim because the return of the stock certificates was "a natural consequence of the running of the statute of limitations." *Id.* at 546. That is, the debtor, like the Law Firm in *Miller, Hiersche*, took the position that the creditor's substantive rights to the collateral in its possession were terminated by the statute of limitations. The court refuted the debtor's contention that the suit for the return of the collateral was not an affirmative claim by observing that the running of the statute of limitations merely defeats a creditor's judicial remedy, it does not defeat the creditor's substantive right to use the collateral already held. *Id.* at 547. Thus, the court concluded that "[i]n requesting return of the stock based on limitations, [the debtor] is using the statute of limitations offensively in an attempt to obtain affirmative relief, rather than defensively to defeat [the creditor's] recovery on the promissory note;" consequently the debtor had revived the creditor's suit to collect on the promissory note. *Id.* at 546.

When comparing these two cases to the one at hand, it is important to remember that a statute of limitation is not intended to address the merits of a

claim to which it is interposed as a bar. *City of Murphy v. City of Parker,* 932

S.W.2d 479, 481-82 (Tex. 1996).   Unlike a statute of repose, a statute of

limitations does not negate a substantive right. *See City of Dallas v. Etheridge*,

253 S.W.2d 640 (Tex.1953).   Rather, the statute is a procedural device that

operates as a defense to bar the remedy by which a party seeks to enforce its

substantive rights. *See id.*  The reason for the bar is "a legislative policy judgment

that requires the diligent pursuit of one's legal rights at the risk of losing them if

they are not timely asserted." *City of Murphy*, 932 S.W.2d at 481-82 (Tex. 1996).

Thus, while a defendant may be morally obligated to a plaintiff, the plaintiff's

remedy to enforce that obligation is barred by limitations after the time prescribed

by the legislature for bringing suit. *Hornblower & Weeks-Hemphill, Noyes, Inc. v.

Crane*, 586 S.W.2d 582, 589 (Tex. Civ. App. – Corpus Christi 1979, *writ ref'd

n.r.e.*).

In that context, the distinction between the facts before the court and the

cases relied upon by the Appellees is readily apparent.  In *Miller, Hiersche* and

*Holman Street Baptist*, the law firm and the debtor took the position that the

substantive rights of the creditors in possession of the collateral were terminated

by operation of the statute of limitations.   In contrast, here, the LP filed suit

seeking judicial remedies against the Appellants long after the statute of

limitations for bringing their claims had run.  Appellants responded by timely

asserting the procedural bar of limitations under Section 16.004(a)(1).   Ignoring the bar and the irrefutable proof that the statute of limitations had run, the trial court entered judgment granting the LP multiple remedies arising out of the debt including a money judgment (albeit subject to limited enforcement), judicial foreclosure and an award of attorneys' fees.   However, there is no justifiable distinction between any of the LP's legal remedies in the face of a timely asserted defense of limitations.   The same statute of limitations that bars collection of the money judgment, bars a judgment for other remedies premised on the debts such as foreclosure and attorney's fees.   *See, e.g., Hoarel Sign Co.*, 910 S.W.2d at 144; *McBryde*, 914 S.W.2d at 619; *Rabo Agrifinance,* 583 F.3d at 352; *Davidson*, 44 F.3d at 253.

Moreover, the *Miller, Hiersche* case and the *Holman Street Baptist* cases are also distinguishable on the basis that the creditors in those cases physically possessed the stock certificates that were the security for the notes.   In the present case, the collateral that is the subject of the judicial foreclosure ordered by the court is not in the possession of the LP.   Specifically, the Final Judgment granted the LP the right to judicially foreclose on a one-third interest in the LLC, one-third interest in the LP, 30,000 shares of Ozelle Pharmaceutical, Inc., and one-third of one unit of Ozelle, LLC.   However, the LP did not demonstrate that it had physical possession of any of that collateral.   The Security Agreements and the pleadings

referenced specific stock certificates in the Corporation.  (CR 193, 195, 247, 253, 262,1400, 1406).  On July 1, 2002, the Corporation was converted to the LP with the LLC as the general partner.  (CR 1272, 1350).  At the time of the conversion, no new certificates were issued for the LP or LLC.  (Id.).

Those LLC and LP interests are intangible property rights that differ from the property rights conferred by ownership of the stock certificates (compare the Delaware Limited Partnership Act [http://delcode.delaware.gov/title6/c017/index.shtml] to Delaware General Corporation Law [http://delcode.delaware.gov/title8/c001/index.shtml]).  Thus, all the stock certificates represent is an ownership interest in a corporation that no longer exists.

Under Texas law, uncertificated partnership interests are classified as general intangibles.  *In re Barr,* 180 B.R. 156, 159 (Bankr. N.D.Tex. 1995); *accord In re Hartman,* 102 B.R. 90, 94 (Bankr. N.D.Tex. 1989).  General intangibles are not subject to possession.  *See e.g., Knostman v. West Loop Savings Ass'n*, 993 F.2d 90 (5th Cir. 1993); *In re Barr,* 180 B.R. at 159.  Since the collateral upon which the LP sought to foreclose is not in its possession, the holdings of the *Miller, Hiersche* and *Holman Street Baptist* cases are inapplicable to the LP's suit for judicial foreclosure.  Consequently, the Trial Court erred in granting judgment for the LP for judicial foreclosure.

### C.    The Notes are not Open Accounts.

In order to avoid the bar of limitations, the LP attempted to characterize the promissory note debt as ongoing open accounts.   However, in *McCamant v. Batsell*, the Texas Supreme Court addressed the issue of whether a promissory note could constitute an open account.   59 Tex. 363, 1883 Tex. Lexis 172 (Tex. 1883).   In *McCamant*, the Supreme Court held that when the extent of liability of the defendant is fixed with respect to the sums due and the time of payment, the debt is not an open account.   *McCamant*, 59 Tex. at 369-70; *see also HIS Indus., Inc. v. Keiger,* 2013 Tex. App. LEXIS 6832, *8-9 (Tex. App. – San Antonio June 5, 2013, no pet.) (mem. op.)

As in *McCamant*, the Promissory Notes here expressly fixed the maximum amount of liability and the date the sums owed were due.   (CR 264, 322, 1191, 1444, 1502, 1898).   The $1,850,000 Note provided that "[t]he principal sum of this Note [$1,850,000] represents indebtedness on the date hereof and future advances to cover interest accruing monthly on the unpaid principal balance and additional advances ***not to exceed in total the principal sum hereof*** when the advance is provided."   (CR 206, 1196, 1358) (emphasis added).    Each note states a specific Maturity Date of either June 30, 2001 or July 1, 2001 and expressly provides that "[a]ll unpaid amounts shall be due by the final scheduled payment date."   (CR 206, 264, 322, 1196, 1358, 1444, 1502).

Moreover, the "course of dealing" between James and the Corporation demonstrates that the parties had no expectation of future dealings on the debt represented by the Promissory Notes once they failed to renew each of them after the expiration of the final maturity date.  Each of the Notes is the final in a series of similar notes dating back over a decade.  (CR 1139, 1147, 1191; 1839, 1848, 1897).  Prior to July of 2001, at the end of each fiscal year, the parties would enter into new notes for the purpose of rolling the preceding year's principal and interest into the renewal notes and extend the maturity date for payment of the principal and interest for another twelve months.  (CR 1160-61, 1865-66).  However, when the $1,850,000 Note came due, the parties did not renew the Note and let the final maturity date stand.   (CR 1160-61, 1866-67).   Although a renewal of the $1,850,000.00 Note was prepared by Wreno for James to sign in 2001, he declined to sign the renewal.  (CR 1161-64, 1867-70).  Moreover, the Draft Renewal Note differed from past practice in that it was not a line of credit allowing for future advances.  (CR 1871-72).

Although Wreno continued to enter James's alleged advances and personal expenses on the general ledger account for the $1,850,000 Note, James never authorized those continuing entries to that account.   (CR 1191-92, 1898-99). Wreno simply unilaterally applied those personal expenses and advances to the $1,850,000 Note past the June 30, 2001 maturity date instead of applying those

sums to other general ledger accounts that existed for James's personal expenses
or to a new general ledger account that it could have created. (CR 1171-75, 1877-
81). Wreno admitted that the $1,850,000 Note did not authorize the continued
charges to the general ledger account for that Note after maturity nor did it
authorize charges in excess of $1,850,000.00. (CR 1174, 1880).

Consequently, the express language of the Notes setting forth the final
maturity dates and specific sums due as well as the parties' own conduct in ending
their series of renewals of the notes, evidence a clear expectation that the dealings
between the parties with respect to the Promissory Note debt would end on or
about July 1, 2001. *See McCamant*, 59 Tex. at 369-70; *HIS Indus.*, 2013 Tex.
App. LEXIS 6832, *8-9. Thus, as a matter of law, the trial court correctly ruled
that the Promissory Notes cannot be considered open accounts and the LP's claims
are barred by the statute of limitations for suits on a debt.

### D.    The LP's Debt Claims are not Claims for Settlement of Partnership Accounts.

In yet another attempt to avoid the statute of limitations and excuse their
delay in bringing suit, the LP claimed that the suit on the Promissory Notes was a
suit between partners to settle a partnership account and thus limitations on the
claim was governed by Tex. Civ. Prac. & Rem. Code § 16.004(c) which provides
that a suit between partners for "a settlement of partnership accounts" does not

accrue until "the day that the dealings in which the parties were interested together cease." (CR 1325-29). However, the LP's claim is simply a claim for a debt owed to the LP as the successor to the Corporation and is not a suit between partners "for a settlement of partnership accounts." Since the debt claim is one that can be brought independently without the necessity of an accounting, the statute of limitations applicable to the "settlement of partnership accounts" is inapplicable. See e.g., *Maxson v. Travis County Rent Account*, 21 S.W.3d 311, 319 (Tex. App. – Austin 1999, pet. dismissed by agr.)(fiduciary duty claim not a claim for settlement of partnership accounts); *see also Warner v. Winn*, 191 S.W.2d 747 (Tex. Civ. App. – San Antonio 1946, writ ref'd n.r.e.) (claim asserted without the necessity of an accounting not subject to limitations for settlement of partnership accounts); *Nelms v. Byrd*, 1998 WL 175683 (Tex. App. – Houston [14th Dist.] April 16, 1998, no pet.) (not designated for publication) (suit to recover on guaranty rather than joint venture agreement not a suit for settlement of partnership accounts). Accordingly, since the debt claim is not a suit between partners for settlement of partnership accounts, the trial court correctly held that it is barred by limitations.

## E.   The LP's Claim is not a Counterclaim arising out of the Same Occurrence or Transaction.

The LP's final argument in its attempt to stave off the effect of limitations

was to try to characterize its intervention as a counterclaim pursuant to Tex. Civ.

Prac. & Rem. Code § 16.069.  Section 16.069 provides:

> (a) If a counterclaim or cross claim arises out of the same transaction
> or occurrence that is the basis of an action, a party to the action may
> file the counterclaim or cross claim even though as a separate action it
> would be barred by limitation on the date the party's answer is
> required.

However, the LP's claim is neither a counterclaim nor a cross claim under Rule 97

of the Texas Rules of Civil Procedure.    Instead, it was a claim made in

Intervention pursuant to Rule 61.  Thus the LP was not "a party to the action" as

contemplated by § 16.069.

As the Fourteenth Court of Appeals recognized in *ABC Express, Inc. v.

Tigator Trucking Service, Inc*., an intervenor, even one who claims an interest in

the subject matter, is essentially a stranger to the lawsuit.  1996 WL 608478, *2

(Tex. App – Houston [14th Dist.] October 24, 1996, no pet.) (not designated for

publication).  Consequently, the trial court correctly ruled that section 16.069 does

not save the LP's debt claims from the bar of the statute of limitations.  *Id*.; *see

also, SJW Property Commerce, Inc. v. Southwest Pinnacle Properties, Inc*., 328

S.W.3d 121, 148 (Tex. App – Corpus Christi 2010, pet. denied) (§16.069 not

applicable to third-party claims); *J.M.K. 6, Inc. v. Gregg & Gregg, P.C*., 192

S.W.3d 189, 201-02 (Tex. App – Houston [14th Dist.] 2006, no pet.) (same);

*Doyer v. Pitney Bowes, Inc*. 80 S.W.3d 215 (Tex. App. – Austin 2002, pet. denied)

(§16.069 inapplicable to claim asserted by intervention defendant against intervenor).

### F.    The Judgment on the LP's Open Account Claim must be reversed and remanded.

Based on the LP's Amended Motion for Summary, the Final Judgment awarded the LP $228,464.10 on its open account claim for "monies borrowed . . . from July 18, 2001 through June 28, 2012." (CR 2784, 2786). However, the LP's Motion for Summary Judgment did not move for a judgment on an open account for that amount or assert that an open account was created on July 18, 2001. Rule 166a expressly requires that a "motion for summary judgment . . . state the specific grounds therefor." Consistent with the Rule, the Texas Supreme Court has held that:

> a motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds expressly presented in the motion. In determining whether grounds are expressly presented, reliance may not be placed on briefs or summary judgment evidence.

*McConnell v. Southside Indep. Sch. Dist*., 858 S.W.2d 337, 341 (Tex. 1993). Thus, the trial court erred in granting a summary judgment on the open account that differed with the specific grounds stated in the LP's Motion. *See e.g., Westbrook Const. Co. v. Fidelity Bank of Dallas*, 813 S.W.2d 752, 754-55 (Tex. App. -- Fort Worth 1991, writ denied).

**SECOND POINT OF ERROR:  The trial court erred in granting Appellees' Motions for Summary Judgment on Appellants' claims.**

**A. Standard of Review.**

In reviewing a no-evidence motion for summary judgment, the reviewing courts must consider the evidence in the light most favorable to the non-movant disregarding all contrary evidence and inferences. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003).  "A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact."  *Id*. at 751.  More than a scintilla of evidence exists when the evidence would enable reasonable and fair-minded people to differ in their conclusions.  *Id.*

**B. A Genuine Issue of Material Fact Exists as to the Breach of the Members Agreement and the Operating Agreement and as to Appellants' Declaratory Judgment Claims**

**1. Introduction.**

The court granted Appellees' No-Evidence Motions for Summary Judgment and dismissed the claims of James and the Trust alleging that Wreno and Ben breached the Operating Agreement and the Members Agreement by imposing unreasonable restrictions on the ability of the Trust to become a Member of the LLC as the specifically authorized assignee of James. The Trial Court erred in doing so because the "terms and conditions" imposed by Ben and Wreno on the

Trust breached the duty of good faith and fair dealing implied in every contract under Delaware law and caused harm to the James and to the Trust which was third-party beneficiary of the ALOC Agreements. Alternatively, even in the event the Assignment of James's LLC interest to the Trust was ineffective to confer Member status on the Trust, the Assignment was void under the terms of the Members Agreement and thus the denial of Member status to James following the Assignment constituted a breach of the Members Agreement and the Operating Agreement.

### 2. *Delaware Law Governs.*

The Operating Agreement provides that the "Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware." (CR 1801, 2125). In addition, the Operating Agreement likewise states that a transfer of a Member's interest is "subject to the terms and conditions of the Members Agreement" and provides that the Members Agreement is "incorporated into [the Operating Agreement] for all purposes." (CR 1800, 2124). Thus, by incorporation, the Members Agreement is subject to the choice of law set forth in the Operating Agreement.

Similarly, the Texas legislature has expressly determined that the law of the state of organization governs the "internal affairs" of a foreign corporation. TEX. BUS. ORG. CODE § 1.102. Since the Operating Agreement states that the LLC was

formed under Delaware law, Delaware law governs the LLC's "internal affairs."
(CR 1796, 2120).   The Texas Business Organizations Code defines "internal
affairs" as including the "rights, powers and duties of . . . governing persons,
officers, owners, and members" as well as "matters relating to membership or
ownership interests." TEX. BUS. ORG. CODE § 1.105. Consequently, Delaware law
applies to James and the Trust's breach of contract claim (as well as the fiduciary
duty claims addressed *infra*).

### 3. The Duty of Good Faith and Fair Dealing under Delaware Law Imposes a Duty on the Member Majority of the LLC to Exercise their Discretion Reasonably and in Good Faith.

Delaware, like many states, implies a duty of good faith and fair dealing in
every contract. *See Dunlap v. State Farm Fire & Casualty Co*., 878 A.2d 434,
440-42 (Del. 2005). This implied covenant requires "a party in a contractual
relationship to refrain from arbitrary or unreasonable conduct which has the effect
of preventing the other party to the contract from receiving the fruits" of the
bargain. *Id*. Consequently, a party breaches the covenant of good faith and fair
dealing "when their conduct frustrates the 'overarching purpose' of the contract by
taking advantage of their position to control implementation of the agreement's
terms." *Id*.

Although, the duty cannot be implied when the contract expressly allows a
particular action, it is in instances where a party is awarded discretion in

implementation where the application of the covenant is particularly useful. *See Hilco Capital, LP v. Federal Ins. Co*., 978 A.2d 174, 178 (Del. 2009). That is, when a contract grants a party discretion, the covenant requires the party to exercise the discretion in a manner so as to not "deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain." *Id*. For example, in *Hilco*, the Delaware Supreme Court held that "despite the fact that the Participation Clause in the Federal policy gave Federal 'sole discretion' whether to participate in the settlement of any claim, Federal still had to exercise that discretion consistent with its covenant of good faith and fair dealing." *Id*.

This principle has been widely applied by Delaware courts in cases involving corporate governance. In fact, the Delaware Court of Chancery has held that "[p]art of corporate managers' proper performance of their contractual obligations is to use the discretion granted to them in the company's organizational documents in good faith." *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC,* 2009 WL 1124451, at *7 (Del. Ch. April 20, 2009); s*ee also Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1206 (Del. 1993) ("[T]he General Partner is obliged to exercise that discretion [to exclude a limited partner from an investment opportunity] in a ***reasonable*** manner." (emphasis in original)); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1055 (Del. Ch. 1984) *aff'd* 575 A.2d 1131 (Del. 1990) ("[I]f one party is given

discretion in determining whether the condition in fact has occurred that party must use good faith in making that determination."); *see generally* Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law,* 60 Bus. Law. 1469, 1480-81 (2005) ("Delaware cases generally support the proposition that the Implied Covenant requires that such discretion must be exercised in good faith and consistent with the reasonable expectations of the parties.").

> ### *4. The Evidence Establishes a Genuine Question of Material Fact as to whether Ben and Wreno Breached their Duty of Good Faith and Fair Dealing.*

In the present case, the Wynne brothers were parties to three agreements – the LP Agreement, the Operating Agreement, and the Members Agreement. The Members' Agreement expressly recognized the intent of the three brothers to transfer their Membership Interest in the LLC to their respective trusts for estate planning purposes. (CR 2130-31, 2564-65). Thus, the parties expressly contemplated the transfer of the Membership Interest, free of any other provisions of the Agreement pertaining to transferees, to the Trust. Likewise, the LP Agreement specifically authorized a transfer of the LP interests from James to the Trust notwithstanding any other provisions in that agreement. (CR 2106, 2539, 2613).

However, Appellees have taken the position that section 14.1 of the Operating Agreement in conjunction with section 3(b) of the Members Agreement, confers unfettered discretion on the Member Majority to impose "terms and conditions" for Transferees of Membership Interests to become Members of the LLC. (CR 1011-12, 2061-62). In the January 19, 2011 Letter (CR 2078, 2150, 2512, 2583) in which Ben and Wreno informed the Trust and James of the decision to impose "terms and conditions" on the Trust's admission as a Member of the LLC, Wreno and Ben relied on Section 14.1 of the Operating Agreement which provides:

> New Members may be admitted to the Company only upon the written approval of a majority in interest of the Members of the Company, and shall be admitted upon such terms and conditions as such Members may determine, consistent with this Agreement and the Members Agreement, the Company's Certificate of Formation and any applicable provision of law or rule of a governmental agency or self-regulating organization which has jurisdiction of the business of the Company.

(CR 2124-25, 2557-58).

However, the conditions imposed by Ben and Wreno bear absolutely no rational relationship to the stated purpose of the Members Agreement, i.e., to "provide for continuity and harmony in the management and operations of the Company . . . ." (CR 1301, 1574, 1697, 1805, 2129, 2284). For example, the two brothers, acting as the Member Majority imposed a condition that Todd Wynne, a

stranger to the transaction, pay an alleged debt to the LP.  (CR 2152, 2585).

Moreover, the conditions imposing restrictions on the Trust's right and obligations with respect to LP interests transferred or to be transferred to it by James are actually in conflict with the parties' agreement.  For example, the first listed condition in the February 11, 2011 Letter was that the Trust agree to execute a note jointly and severally with James reaffirming James's alleged debt to the LP and to also agree to affirm the security for that debt.  (Id., CR 2059-60, 2152, 2491-92, 2585).  That is, as a condition for admission as a Member of the LLC, Wreno and Ben wanted the Trust to admit that should James transfer his LP interest to the Trust, the LP would have a lien for James's debts on the Trust's LP interests.  (CR 2059-60, 2491-92).

These conditions on LLC membership status were for all intents and purposes an attempt to impose restrictions on the transferability of the LP interests from James to the Trust in direct conflict with the provisions of the LP Agreement that all three of the brothers had agreed to and that expressly provided for an unfettered transfer of those interests to the Trust.  (CR 2016, 2539, 2613).  The terms of the LP Agreement were heavily negotiated, the brothers knew that each of them owed debts to the LP at the time they entered into the Agreement and despite that the three brothers all agreed that each of them could transfer his LP interest without restriction.  (CR 2613-16).

Similarly, the condition that the Trust agree in advance to "additional noticed assessments" under the LP Agreement was simply another attempt to circumvent the negotiated provisions and procedures set forth in that Agreement. (CR 2091, 2524).   And, the condition that the Trust agree that a change in its Trustees shall constitute a transfer of membership interests and thus re-trigger the application of the terms and conditions imposed by the Operating Agreement on such transfers conflicted with the express provision of the Members Agreement allowing for transfers to the Members' respective trusts since nothing in the Operating Agreement or the Members Agreement authorized any measure that required a Member to re-qualify subsequent to becoming a Member.

Consequently, based upon the conduct described above, the evidence establishes a genuine question of material fact as to the breach of the duty of good faith and fair dealing implied in the Operating and Members Agreements as well as to the merit of James and Trust's claims for Declaratory Relief based on those breaches of the agreements.

### 5.  *Alternatively, the denial of Member status to James following a Faulty Assignment of the Member Status Constitutes a Breach of the Members Agreement and the Operating Agreement.*

The Assignment of the LLC interest from James to the Trust expressly stated in the clause labeled "Conveyance" that:

> Assignor [James] hereby assigns, transfers, conveys, and
> delivers to Assignee [the Trust] the Transferred Interest.
> ***Assignee thereby becomes a substitute Member in place
> of Assignor***.

(CR 2077, 2510) (emphasis added).  Pursuant to the terms of Section 3(a) of

the Members Agreement, "[a]ny purported Transfer in violation of this Agreement

***will be null and void*** and ***will not*** operate to Transfer ***any*** interest or title in the

purported Transfer."   (CR 2130-31, 2564-65) (emphasis added).   Thus, to the

extent that the Trust was not entitled to automatically become a Member of the

LLC, the Assignment was "null and void."

Unlike the other provisions that Defendants rely upon, Section 3(b) of the

Members Agreement does not allow for discretion.  That is, a transfer that purports

to transfer an interest in violation of the terms of the Agreement, is not voidable at

the whim of the Members, it is "null and void."  If the Trust is not a Member as

stated in the Assignment's Conveyance, the Assignment is void does not operate

to transfer any interest or title in the purported transfer.   Consequently, if the

transfer never occurred, James remains a Member of the LLC and Ben and Wreno

have breached the Agreements by excluding him from the operations and

management of the LLC.

**6. *The Recording of the Transfer constitutes a Ratification of the Membership Status of the Trust and/or a Waiver of the Right to Impose Conditions on the Trust for Member Status.***

The affirmative defenses of waiver and ratification also justify the reversal of the Judgment granting Appellees' No-Evidence Motions for Summary Judgment.  (CR 2419)  The elements of ratification are (1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, and (3) with the intention of giving validity to the earlier act. *White v. Harrison,* 390 S.W.3d 666, 672 (Tex. App.--Dallas 2012, no pet.) A party ratifies an agreement when – after learning all of the material facts – he confirms or adopts an earlier act that did not then legally bind him and that he could have repudiated.  *Id.*  The actual intent to ratify the earlier act is not required. *Old Republic Ins. Co. v. Fuller*, 919 S.W.2d 726, 728 n.1 (Tex. App. – Texarkana 1996, writ denied).  The intent required is the voluntary, intentional performance of an act inconsistent with the intention of avoiding the ratified agreement.  *Id.*

Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.  *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987).  Thus, like ratification, waiver is largely a question of intent. *Kennedy v. Bender*, 135 S.W. 524, 525 (1911).

Ben and Wreno eventually recorded the transfer of the LLC interest from James to the Trust in December of 2011. (CR 2044, 2478). They did so despite the fact that the Assignment provided that the "Assignee thereby becomes a substitute Member in place of Assignor." (CR 2077, 2510). Ben acknowledged that he reviewed the Assignment, including the quoted provision, prior to entering the transfer into the books of the LLC. (CR 2611-12).

Moreover, the Members Agreement provides that:

> A Transfer will not be recorded on the books of the company until the Member owning such Membership Interest has fully and completely complied with the terms of this Agreement **and any additional requirements imposed by the Member Majority**.

(CR 2130, 2564) (emphasis added). Thus, by accepting and recording the transfer with the full knowledge that the Assignment confers Member status upon the Trust and with the knowledge that the Transfer should not have been recorded absent compliance with the additional requirements, Wreno and Ben ratified the Assignment as a whole by voluntarily performing an act inconsistent with their supposed desire to nullify the transfer of Member status. Likewise, by voluntarily recording the Transfer including the transfer of Member Status, Ben and Wreno waived their right to enforce the conditions they assert they are allowed to impose on the Trust to become a member.

### 7.  *James and the Trust have been Damaged as a Result of the Breach.*

In their July 14, 2011 Letter, Wreno and Ben claimed that since the Trust was merely an "Assignee of Member's Interest" and James was nothing more than a limited partner of the LP, neither was entitled to take part in the management of the company and James would be prohibited from further access to his office and the company property.  They even threatened James with "criminal trespass" if he attempted to gain access or entry to the LLC office. Since July 14, 2011, James and the Trust have been barred from participation as a member of the LLC.  (CR 2156-57, 2589-90).   Among the decisions that James and the Trust have been excluded from is the decision to admit Wreno's children as new Members of the LLC without providing James or the Trust with the right of first refusal to which they would have been entitled under the Operating Agreement.  (CR 2018, 2514, 2671).

As remedies for the breach of contract, James and the Trust sought both injunctive relief and specific performance as expressly provided for in the Members Agreement.  (CR 2234, 2236).  Courts have consistently held that when corporate managers or majority stakeholders undertake actions that prevent minority shareholders from participating in management and exercising their right to vote on issues of corporate governance, those being excluded have suffered irreparable harm of the sort justifying the application of equitable remedies such as

injunctive relief or specific performance. *See Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd*., 339 F.3d 101, 114 (2d Cir. 2003); *International Banknote Co., Inc. v. Muller,* 713 F.Supp. 612, 623 (S.D.N.Y. 1989) (corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares). As the Court in *Wisdom Import* stated, "the right to participate in management . . . has intrinsic value." *Wisdom Import Sales Co.,* 339 F.3d at 114. Accordingly, James and the Trust suffered damage justifying equitable relief and sufficient to raise an issue of material fact.

### C. A Genuine Issue of Material Fact Exists as to Ben and Wreno's Breach of Fiduciary Duty

#### 1. Ben and Wreno Owed Fiduciary Duties of Loyalty and Care to James and the Trust as Members of the LLC and as Attorney for the LLC.

Under Delaware law, managers and members of a limited liability company owe traditional fiduciary duties of loyalty and care to each other and to the company. *Kelly v. Blum*, 2010 WL 629850, at *10 (Del. Ch. February 24, 2010); *see e.g*., *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC,* 2009 WL 1124451, at *7 (Del. Ch. April 20, 2009). Thus, in the context of the LLC in this case, Ben and Wreno owed a fiduciary duty to James while he was a member and to the Trust once James's interest was assigned to the Trust (assuming that the Assignment was not null and void). *See Kelly*, 2010 WL 629850, at *12

(controlling members in a LLC owe minority members "the traditional fiduciary duties" that controlling shareholders owe minority shareholders).  In addition, Wreno's conduct is all the more egregious due to Wreno's status as the general attorney for the LLC and LP and his activities in assisting James with other legal matters.  (CR 2063-68).

## 2. *Ben and Wreno Breached their Fiduciary Duty as Members of the LLC thereby causing Injury.*

Ben and Wreno breached their fiduciary duties in a multitude of ways. First, they failed to disclose to James their intention as the Member Majority to impose restrictions on the transfer of James's membership interest in response to specific requests by James that Wreno provide him with information about the "additional requirements" vaguely referenced in the July 26, 2010 Letter. (CR 2030, 2077, 2465, 2510).  Despite James's request, Wreno did not identify those "additional requirements" until after the day after the transfer of James's LLC interests was completed.  (CR 2030, 2077, 2465, 2510).

The reason for Wreno's "game of gotcha" is clear.  At around that same time he sent the July 26, 2010 letter, Wreno reached out to outside counsel regarding his concerns about how the transfer of James's interests would affect the LP's rights with respect to James's debt and the security for that debt.  (CR 2050-52, 2055, 2485-2488).  Wreno was seeking advice with respect to a mechanism for

protecting the collateral for the notes – that is, James's interests in the LP.  (CR 2057-58, 2489-90).  Thus, it was Wreno's intention all along to use the "terms and conditions" of section 14.1 to force the Trust to agree to protections for the collateral.

After James executed the Assignment transferring his LLC membership interest to the Trust and provided his brothers with a copy that of the Assignment which provided that that "Assignee thereby becomes a substitute Member in place of Assignor," neither Wreno nor Ben pointed out to James that they believed that provision was incorrect and that they intended to impose additional requirements on the LLC's ability to attain member status.  (CR 2077-78, 2510-11).  Even when James requested clarification of Wreno's comments to the effect of "are you sure you want to do this" and "you may not be happy with the result," Wreno refused to reveal the intent to impose the restrictions despite admitting that "he was fully aware" of [section 14 of the Operating Agreement and Section 3(b) of the Members Agreement] at the time."  (CR 2042-33, 2078-97, 2476, 2511). Instead, Wreno and Ben waited until the next day to inform James and the Trust that they intended to impose conditions on the Trust's ability to attain member status in the LLC.  (CR 2079, 2150, 2512, 2583).

When Ben and Wreno finally advised the Trust of the "conditions" that they determined had to be met before they would allow the Trust to be admitted as a

member, those conditions were unreasonable and unrelated to the management of

the LLC. (CR 2152, 2585).  Moreover, the conditions imposed were the subject of

the advice Wreno was seeking from outside counsel back in the summer of 2010

when he was refused to respond to James's inquiries about the undisclosed "terms

and conditions" referenced by Ben and Wreno's letter.  (CR 2050-52, 2055, 2057-

58, 2485-88, 2489-90).

    After the Trust refused the conditions, Wreno and Ben refused to allow

James or the Trust to take part in the management of the company, prohibited

James from further access to his office and the company property and even

threatened James with "criminal trespass" if he attempted to gain access or entry to

the LLC office.  (CR 2156-57, 2589-90).  These actions raise a genuine issue of

material fact as to Wreno and Ben's breach of fiduciary duty and the harm suffered

by James and the Trust.

### D. Ben and Wreno Breached their Fiduciary Duty owed as Controlling Stakeholders of the LLC as the General Partner of the LP and their conduct justifies the Equitable Remedy of Disgorgement.

Appellants asserted a second breach of fiduciary duty claim based on the

fiduciary duties Wreno and Ben owed as the controlling stakeholders of the LLC,

as the general partner for the LP, to the limited partners of the LP as well as

members of the LLC.  (CR 2236, 2414).  Under Delaware law, the affiliates of a

general partner who exercise control over the partnership's property owe fiduciary

duties to both the partnership and its limited partners. *See In re USACafes, L.P. Litigation,* 600 A.2d 43 (Del. Ch. 1991); *accord Wallace v. Wood,* 752 A.2d 1175 (Del. Ch. 1999*).* Those duties are the same as the general partner in a limited partnership which is generally required "to exercise the utmost good faith, fairness, and loyalty." *Boxer v. Husky Oil Co*., 429 A.2d 995, 997 (Del. Ch. 1981). By engaging in transactions for the purpose of diluting or extinguishing the minority interests of James and the Trust while enhancing their own voting rights and economic interests in the LP and LLC, Ben and Wreno breached these fiduciary duties including the duty of loyalty.

Specifically, the LP and the LLC, under the control of Ben and Wreno, brought suit against James and the Trust to collect on the Notes or alleged open accounts and to foreclose on the collateral allegedly securing those notes including the LP and LLC interests owned by James and/or the Trust.  However, at that time, Defendants Ben and Wreno also owed substantial debts in the nature of notes and open accounts to the LP.  (CR 2621-67, 2699).   Most of these debts had been in default for almost a decade.  (Id.).  Some of Ben and Wreno's debts to the LP were secured by their one-third share of ownership in the LP. (CR 2669).  In fact, all three brothers were presented with Renewal Notes to execute in 2001 and all three (not just James) declined to execute the renewals.  (CR 2602-03; 2669).

Despite this, Wreno and Ben refused to act as controlling members of the general partner to declare their significant debts to the LP in default and collect or foreclose upon those debts.  (CR 2493, 2681).  Instead, they proceeded to erase the debt they owed to the LP.  Specifically, Ben and Wreno hatched an accounting scheme whereby each shareholder would receive a $10,000.00 distribution designated as a "Distribution K" each month beginning in January 2009.  (CR 2621-2667, 2681, 2687-88).  The Distribution K's were credited to each limited partner's debt and the limited partner's capital account was debited for a corresponding amount.  (CR 2599, 2603, 2681, 2687-88)  Prior to those credits being applied to their debts, Ben and Wreno together owed over $1,000,000.00 in receivables to the LP.  (CR 2641-43).

The Distribution K's were made without James's knowledge or consent and were made in breach of the LP Agreement.  (CR 2681).  Moreover, the "Distribution K's" violated the LP Agreement.  Pursuant to Section 9.1 of the LP Agreement the general partner may only make distributions from "available cash" and it is undisputed that the LP did not have the available cash to make the distributions.  (CR 2095, 2528, 2604, 2681).  In addition, the LP Agreement does not permit the partners to withdraw or receive any return of their capital contributions.  (CR 2092, 2525).

Perhaps most importantly, the distribution K's did not benefit James since the amount of the distributions did not exceed the interest accruing on his debt. (CR 2681).  In contrast, Ben and Wreno's debts were not being charged interest. (Id.).  Consequently, not only were the Distribution K's not authorized by the LP Agreement, those dummy distributions only served to further the interests of Ben and Wreno by allowing them to extinguish their own debt without paying income taxes on forgiveness of debt while using James's debt as a means to eliminate him as a minority shareholder so that they could take over the LP and its assets.

Instead of taking action to collect their own debt, Wreno and Ben focused their collection efforts solely upon James and the Trust in order to seize 100% ownership of the LP.  By doing so, Wreno and Ben breached their duty, as the controlling stakeholders of the general partner, to not engage in these self-dealing transactions for the purpose of diluting or extinguishing the minority shareholder's interest while enhancing their own voting rights and economic interests in the LP. Such conduct is sufficient to raise a genuine issue of material fact as to breach of fiduciary duty.

As discussed above, Wreno and Ben sought to foreclose, and, barring success in this appeal have obtained a judgment for foreclosure on James's and the Trust's LP and LLC interests while ignoring their own defaults.  In Texas, courts are allowed to fashion equitable remedies such as profit disgorgement and fee

forfeiture to remedy a breach of fiduciary duty. For instance, courts may disgorge all ill-gotten profits from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal, or competes with a principal. *See, e.g., Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 200 (Tex. 2002)* (stating the rule that courts may disgorge any profit where "an agent diverted an opportunity from the principal or engaged in competition with the principal, [and] the agent or an entity controlled by the agent profited or benefitted in some way"). Appellees sought a judgment at the trial court for an order requiring Ben and Wreno to turn over or disgorge to James and the Trust a one-third interest in the LP and the LLC that Ben and Wreno illicitly gained for themselves or took from James and the Trust in order to rectify the breach of fiduciary duty. (CR 2236, 2417). The loss, or potential loss of that interest, and the availability of the remedy of disgorgement suffices to create a genuine issue of material fact on the element of damages caused by the breach of fiduciary duty.

### E. A Genuine Issue of Material Fact Exists as to Ben and Wreno's Fraud.

The trial court granted Appellees' No-Evidence Motions for Summary Judgment with respect to Appellants' fraud claim. Appellees had alleged, among other things, that there was no evidence of the required element of misrepresentation. However, a failure to disclose may also constitute fraud. In

*Myre v. Meletio,* 307 S.W.3d 839, 843 (Tex.App. – Dallas 2010, pet. denied), the Dallas Court of Appeals explained that "[f]raud by omission is a subcategory of fraud because the omission or non-disclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose."   Accordingly, silence may be equivalent to a false representation when the circumstances impose a duty to speak on the party and he deliberately remains silent."   *Bradford v. Vento,* 48 S.W.3d 749, 755 (Tex. 2001).   A duty to disclose may arise in certain situations involving partial disclosure or when the parties have a confidential or fiduciary relationship. *See Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.,* 237 S.W.3d 379, 385 (Tex.App.-Houston [14th Dist.] 2007, no pet.). Whether such a duty exists is a question of law.   *Marshall v. Kusch,* 84 S.W.3d 781, 786 (Tex. App.-Dallas 2002, pet. denied).

In the present case, the circumstances imposed a duty to disclose on Wreno and Ben, even separate and apart from the clear fiduciary duty that each of them owed to James and the Trust.   This duty was imposed by their knowledge that James was unaware of their intentions to impose "terms and conditions" on the Trust's admission as a member in order to try to enforce James's debt obligation. For Wreno and Ben to deliberately stay silent about the ability of the Member Majority to impose those terms and condition and their intent to do so, constitutes a clear and unambiguous case of constructive fraud by non-disclosure. *See e.g.,*

*Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex. 2001).

As discussed above with respect to the breach of fiduciary duty, James, individually and on behalf of the Trust, was relying on the Wreno and Ben to disclose the information with respect to the additional terms and conditions. Wreno and Ben failed to disclose that information and and James and the Trust suffered injury by means of their exclusion from the governance and management of the LLC. (CR 2078, 2511; see pages 52-53, 57 *supra*) Consequently, a genuine issue of material fact exists as to the elements of Appellants fraud claim.

### F. A Genuine Issue of Material Fact Exists as to the Conspiracy Claim.

The elements of a claim for conspiracy are:

1. two or more persons;
2. an object to be accomplished;
3. a meeting of the minds on the object or course of action;
4. one or more unlawful, over acts; and
5. damage to James and the Trust.

*See Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 80 (Tex. App. – Houston [14th Dist.] 2004, no pet.). In the present case, there is ample evidence that Ben and Wreno conspired together to breach their fiduciary duties. First, both Ben and Wreno signed the July 26, 2010 Letter to James vaguely referencing "additional requirements" that might impact the transfer of James's Membership Interests. (CR 2140, 2573) Second, Ben and Wreno conferenced together and Ben conferred with his attorney regarding the January 19, 2011 Letter that

belatedly informed the Trust that the Trust was not a Member of the LLC and that they had determined to impose some unknown conditions on the Trust to attain Member status.  (CR 2031-34, 2048-49, 2466-69,2483-84)  They both then signed the letter and presented it jointly to James as a representative of the Trust at the LLC meeting on January 19, 2011.  (CR 2079, 2150, 2512, 2583)  Lastly, both gentlemen also signed the February 11, 2011 Letter imposing the unreasonable conditions on the Trust to become a Member of the LLC as well as the letter denying James and the Trust further access to the offices of the business.  (CR 2152, 2585)

In addition, both Ben and Wreno were conspired in the "Distribution K" scheme to erase their own debt while foreclosing on James's LP and LLC interests.  (see pages 57-61 *supra*).   These acts, along with the damage to James and the Trust discussed in pages 52-54 supra, raise a genuine issue of material fact as to Appellants' claim for conspiracy.

## <u>CONCLUSION AND PRAYER</u>

Having waited over ten years to bring its debt claim in a court of law, the LP is barred from obtaining a remedy of any sort arising out of the Promissory Notes. Consequently, the trial court erred in entering judgment for the LP for the amounts owed on the Notes, foreclosure on the collateral and attorneys' fees.  Likewise, the trial court erred in denying Appellants' Motion for Summary Judgment which

conclusively proved the application of the bar of limitations to the LP's claims. Accordingly, Appellants respectfully request that this Court reverse the judgment of the trial court, render a take nothing judgment against the LP on its promissory note and open account claims with the exception of those open accounts debts allegedly incurred after the maturity of notes which should be remanded to the trial court for further proceedings.

Also, the duty of good faith and fair dealing and the principles of fiduciary duty under Delaware law also prohibit Wreno and Ben Wynne from engaging in a game of "gotcha" with their brother and fiduciary James. Thus, Appellants also respectfully request that the Court reverse the entry of summary judgment dismissing Appellants' claims for breach of contract, declaratory judgment, fraud, breach of fiduciary duty and conspiracy and remand those claims to the trial court for a trial on the merits.

Respectfully submitted,

BLAIES & HIGHTOWER, L.L.P.
421 W. Third Street, Suite 900
Fort Worth, Texas 76102
817-334-0800 (Telephone)
817-334-0574 (Facsimile)

By: _____

GREGORY P. BLAIES
State Bar No. 02412650
E-mail: gregblaies@bhilaw.com

GRANT D. BLAIES
State Bar No. 00783669
E-mail: grantblaies@bhilaw.com

GREG S. GOBER
State Bar No. 00785916
E-mail: greggober@bhilaw.com

ATTORNEYS FOR APPELLANTS
THE JW GST EXEMPT TRUST
AND JAMES Y. WYNNE

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing instrument was forwarded to all attorneys of record named below on October 17, 2014.

Hilaree A. Casada                       _____ CERTIFIED MAIL, RRR
COWLES & THOMPSON, P.C.                  _____ U.S. FIRST CLASS MAIL
901 Main Street, Suite 3900             _____ FACSIMILE @ 214-672-2377
Dallas, TX 75202                        _____ HAND DELIVERY
hcasada@cowlesthompson.com              __X__ ELECTRONIC SERVICE/E-MAIL

David Bird                              _____ CERTIFIED MAIL, RRR
SKIBELL, BOHACH & ARCHER, P.C.          _____ U.S. FIRST CLASS MAIL
17110 Dallas Parkway, Suite 214         _____ FACSIMILE @ 972-735-8121
Dallas, TX 75248                        _____ HAND DELIVERY
dbird@birdskibell.com                   __X__ ELECTRONIC SERVICE/E-MAIL

Eric D. Archer                          _____ CERTIFIED MAIL, RRR
SKIBELL, BOHACH & ARCHER, P.C.          _____ U.S. FIRST CLASS MAIL
17110 Dallas Parkway, Suite 214         _____ FACSIMILE @ 972-735-8121
Dallas, TX 75248                        _____ HAND DELIVERY
earcher@birdskibell.com                 __X__ ELECTRONIC SERVICE/E-MAIL


_____
Greg S. Gober

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the requirements of Tex. R. App. P. 9.4(i)(3), I hereby certify

Appellants' Brief contains 14,998 words.

_____
Greg S. Gober

# APPENDIX

# **APPENDIX**

Final Judgment signed February 7, 2014

FILED FOR RECORD
KAUFMAN COUNTY
TEXAS

**CAUSE NO. 84117-86**

2014 FEB -7 PM 4: 19

| | | |
|---|---|---|
| THE JW GST EXEMPT TRUST, | § | IN THE DISTRICT COURT OF |
| by and through its Trustee, James Y. Wynne | § | ~~RHONDA HUGHEY~~ |
| | § | DISTRICT CLERK |
| Plaintiff and Counter-Defendant | § | |
| | § | BY_____DEPUTY |
| **and** | § | |
| | § | |
| JAMES Y. WYNNE, Individually | § | |
| | § | |
| Intervenor, Plaintiff and Counter- | § | |
| Defendant | § | |
| v. | § | |
| | § | |
| ERIN ANNE WYNNE, as Independent | § | |
| Executrix of The Estate of WRENO S. | § | |
| WYNNE (Deceased) and WILLIAM | § | **KAUFMAN COUNTY, TEXAS** |
| BYWATERS as Independent Executor of the | § | |
| Estate of WILLIAM B. WYNNE (Deceased) | § | |
| | § | |
| Defendants And Counter-Plaintiffs | § | |
| | § | |
| **and** | § | |
| | § | |
| AMERICAN LIBERTY OIL COMPANY, | § | |
| LP and AMERICAN LIBERTY OIL | § | |
| COMPANY, LLC | § | |
| | § | |
| Defendants and Counter-Plaintiffs | § | **86th JUDICIAL DISTRICT** |

### FINAL JUDGMENT

On August 21, 2012, the Court heard and considered the following motions:

- Wreno S. Wynne, American Liberty Oil Company, LLC and American Liberty Oil Company, LP's First Amended Motion for Summary Judgment filed July 31, 2012; and

- The JW GST Exempt Trust and James Y. Wynne's Motion for Summary Judgment filed July 27, 2012.

The parties appeared in person and through their respective attorneys and announced ready for the hearing. After reviewing the pleadings, motions, responses, replies, summary judgment proof and arguments of counsel, the Court found that good cause existed to grant

2782

Summary Judgment in favor of American Liberty Oil Company, LP and American Liberty Oil Company, LLC, in part, and against James Y. Wynne and the JW GST Exempt Trust in this case.

The Court signed an interlocutory summary judgment order on November 13, 2012, which granted the First Amended Motion for Summary Judgment in part, continued the remaining issues in the First Amended Motion for Summary Judgment, continued other motions on file with the Court but not heard, and denied The JW GST Exempt Trust's and James Y. Wynne's Motion for Summary Judgment. That interlocutory order as reformed and modified herein is now merged into this Final Judgment.

On December 16, 2013, the Court heard and considered the following motions:

(1)     Wreno Wynne, American Liberty Oil Company, LLC and American Liberty Oil Company, LP's No Evidence Motion for Summary Judgment and Brief in Support filed May 22, 2012;

(2)     Defendant William B. Wynne's Amended No Evidence Motion for Summary Judgment filed July 31, 2012;

(3)     Wreno S. Wynne, American Liberty Oil Company, LLC and American Liberty Oil Company, LP's Supplement to their No Evidence Motion for Summary Judgment and Brief in Support and Reply to the JW GST Exempt Trust and James Y. Wynne's Response to Movant's No Evidence Motion for Summary Judgment filed August 1, 2012;

(4)     The JW GST Exempt Trust and James Y. Wynne's Amended Response to:

    a.      Defendant William B. Wynne's No Evidence Motion for Summary Judgment; and

    b.      Intervenors American Liberty Oil Company, LP and American Liberty Oil Company, LLC, and Defendant Wreno Wynne's No Evidence Motion for Summary Judgment; and

    c.      Intervenors American Liberty Oil Company, LP and American Liberty Oil Company, LLC, and Defendant Wreno Wynne's Traditional Motion for Summary Judgment filed June 21, 2012.

(5)     The JW GST Exempt Trust's and James Y. Wynne's Application for Temporary Injunction.

2783

The parties appeared in person and through their respective attorneys and announced ready for the hearing. After reviewing the pleadings, motions, responses, replies, summary judgment proof and arguments of counsel, the Court finds that the No Evidence Motions for Summary Judgment filed on behalf Wreno S. Wynne (now Wreno S. Wynne's Estate), American Liberty Oil Company, LLC, American Liberty Oil Company, LP, William B. Wynne (now William B. Wynne's Estate), and the First Amended Motion for Summary Judgment filed on behalf of Wreno S. Wynne (now Wreno S. Wynne's Estate), American Liberty Oil Company, LLC, American Liberty Oil Company, LP, should be granted in their entirety. The Court has also determined that there is no evidence to support any of Plaintiff's and Intervenor's causes of action and claims for relief, including no evidence to support the declarations requested by Plaintiff and Intervenor in their request for declaratory relief, that Plaintiff and Intervenor should take nothing by way of their claims against Wreno S. Wynne (now Wreno S. Wynne's Estate), American Liberty Oil Company, LLC, American Liberty Oil Company, LP, William B. Wynne (now William B. Wynne's Estate), that Plaintiff and Intervenor are not entitled to the declaratory relief sought, and that Plaintiff's and Intervenor's Application for Temporary Injunction should be denied as moot.

The Court finds that monies advanced by American Liberty Oil Company, LP and American Liberty Oil Company, LLC to James Y. Wynne or on his behalf on and after July 18, 2001, are open account loans not barred by the statute of limitations. The Court further finds that American Liberty Oil Company, LP's and American Liberty Oil Company, LLC's right to foreclose on the collateral of three Promissory Notes of James Y. Wynne and dated July 1, 2000, in the principal sums of $1,850,000.00, $206,204.24 and $90,725.19, respectively, of James Y. Wynne is not barred by the statute of limitations, but that the action for damages on the Promissory Notes against James Y. Wynne and the JW GST Exempt Trust is barred by the statute of limitations.

During the pendency of this lawsuit, William B. Wynne died on July 31, 2013, and Wreno S. Wynne died on December 20, 2013. Suggestions of Death were filed for each of the foregoing deceased parties and an answer or appearance was filed on behalf of the personal representative of their respective estates prior to the entry of this Final Judgment.

Accordingly, the Court hereby renders the following Final Judgment:

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that Wreno S. Wynne's, American Liberty Oil Company, LLC's and American Liberty Oil Company, LP's No Evidence Motion for Summary Judgment is hereby granted. Further, Wreno S. Wynne's, American Liberty Oil Company, LLC's and American Liberty Oil Company, LP's First Amended Motion for Summary Judgment and Brief in Support is hereby granted and the Interlocutory Summary Judgment where consistent with this Final Judgment is hereby merged herein and made final.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that William B. Wynne's Amended No Evidence Motion for Summary Judgment is hereby granted.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the JW GST Exempt Trust's and James Y. Wynne's Motion for Summary Judgment is hereby denied.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that American Liberty Oil Company, LP shall have and recover judgment in the total sum of $4,332,381.28 representing the principal and interest due from July 1, 2000 through February 4, 2014, on the "$1,850,000.Promissory Note"(including credit of $8,000 each month for Distribution K payments from 9/1/2012 through 12/31/2013, plus $172,234.95 and $42,178.11, representing the balances due as of February 4, 2014 respectively on the "$206,204.24 Note and the "$90,725.19 Note" at no interest and after credit on each Note for Distribution K credits of $1,000. per month on each Note from 4/01/2012 through 12/31/2013.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that American Liberty Oil Company, LP is the owner and holder of the three Promissory Notes of James Y. Wynne, in the original principal sums of $1,850,000.00, $206,204.24 and $90,725.19 and that American Liberty Oil Company, LP is hereby GRANTED, in all things, the right to foreclose on the collateral securing such Promissory Notes by judicial foreclosure to satisfy payment of the judgment on the note obligations and costs recited herein. An order of sale shall issue to any Sheriff or any Constable within the State of Texas, directing him to seize and sell the collateral as under execution, in satisfaction of the three above referenced Promissory Notes.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the foregoing Note judgment amounts shall be paid from the foreclosure of the collateral of the Promissory Notes without personal liability against James Y. Wynne or the JW GST Exempt Trust. The collateral of the Promissory Notes includes the original corporate stock of James Y. Wynne in American Liberty Oil Company, a Delaware corporation, and James Y. Wynne's and the JW GST Exempt Trust's interest in American Liberty Oil Company, LLC and American Liberty Oil Company, LP received from the conversion of James Y. Wynne's stock in American Liberty Oil Company together with the other collateral listed in the respective Security Agreements and modifications thereof which collateral is specifically identified as follows:

1.    The one-third (1/3) membership interest in American Liberty Oil Company, LLC owned by the JW GST Exempt Trust.

2.    James Y. Wynne's thirty-three per cent (33%) limited partnership interest in American Liberty Oil Company, LP;

3.    James Y. Wynne's beneficial interest in 30,000 shares of common stock of Ozelle Pharmaceutical, Inc., and James Y. Wynne's one-third (1/3) interest of one(l) Unit of Ozelle, L.L.C.;

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that American Liberty Oil Company, LP shall be entitled to and shall have judgment for post judgment interest on the foregoing note amounts calculated as follows:

1.    $4,012,212.54 shall accumulate post judgment interest at the rate of 7.5% per annum.

2.    The other two judgment Note amounts of $172,234.95 and $42,178.11 shall

accumulate post judgment interest at the rate of 5% per annum.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that American Liberty Oil Company, LP have and recover judgment of and from James Y. Wynne the sum of $211,487.68 for monies borrowed from American Liberty Oil Company, LP and paid to or on behalf of James Y. Wynne as open account loans from July 18, 2001 through June 28, 2012, plus recover prejudgment interest on the award of $211,487.68 at the rate of 5% simple interest from June 28, 2012 through February 4, 2014, in the sum of $16,976.42 for total judgment amount on the open account loans in the amount of $228,464.10.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that American Liberty Oil Company, LP and Wreno S. Wynne (now Wreno S. Wynne's estate) shall have and recover judgment of and from James Y. Wynne and the JW GST Exempt Trust, jointly and severally, in the sum of $44,528.98 for their reasonable and necessary attorney's fees incurred by American Liberty Oil Company, LP and Wreno S. Wynne (now Wreno S. Wynnne's estate) through the date of hearing on August 21, 2012, plus costs of court incurred herein.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff's and Intervenor's Request for Declaratory Judgment is hereby denied.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff's and Intervenor's Application for Temporary Injunction is hereby denied as moot.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff and Intervenor take nothing by way of their claims against Wreno S. Wynne (now Wreno S. Wynne's Estate), American Liberty Oil Company, LLC, American Liberty Oil Company, LP, and William B. Wynne (now William B. Wynne's Estate).

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all taxable costs of court incurred by Wreno S. Wynne (now Wreno S. Wynne's Estate), American Liberty Oil Company, LLC, American Liberty Oil Company, LP, William B. Wynne (now William B. Wynne's Estate) shall be taxed against Plaintiff and Intervenor, jointly and severally.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the money judgment of $228,464.10, and taxable court costs rendered in favor of American Liberty Oil Company, LP herein shall bear post-judgment interest at the rate of five percent (5%) per annum, compounded annually, from the date of this judgment until paid.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the money judgment for attorney's fees rendered in favor of American Liberty Oil Company, LP and Wreno S. Wynne (now Wreno S. Wynne's Estate), herein shall bear post-judgment interest at the rate of five percent (5%) per annum, compounded annually, from the date of this judgment until paid.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all writs and processes allowed by law for the enforcement and collection of this judgment or the costs of court may issue as necessary.

2786

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this judgment finally disposes of all parties and all claims and is appealable.

**IT IS SO ORDERED.**

SIGNED ON this _____ day of _____, 2014.

_____
PRESIDING JUDGE

Approved as to form only:

_____
GREGORY S. GOBER, attorney for
the JW GST Exempt Trust and
James Y. Wynne

_____
DAVID E. BIRD, attorney for
Estate of Wreno S. Wynne, deceased
and American Liberty Oil Co., LLC
and American Liberty Oil Co., LP

_____
ERIC D. ARCHER, attorney for
Estate of William B. Wynne,
deceased